84 P.3d 509

Nobuo MIYAMOTO and Asako
Miyamoto, Plaintiffs–
Appellants,

v.

Kenneth W. LUM, Sr. and Alejandro Lazo,
D.C., Defendants/Cross–Claim-
ants/Cross–Claim, Defendants–Appel-
lees,

and

Petronilo Garces and Jolena Garces,
Defendants/Cross–Claimants/Cross–
Claim, Defendants,

and

John Does 1–10, Jane Does 1–10, Doe Part-
nerships 1–10, Doe Corporations 1–10,
Doe Entities 1–10, and Doe Governmen-
tal Units 1–10, Defendants.

No. 24288.

Supreme Court of Hawai'i.

Feb. 6, 2004.

Kevin H.S. Yuen, Wailuku, on the briefs, for plaintiffs-appellants.

Paul K. Hoshino, Honolulu, on the briefs, for defendant-appellee Kenneth W. Lum, Sr.

Richard C. Sutton, Jr. and Jason M. Tani, Honolulu, (of Rush Moore Craven Sutton Morry & Beh), and Ray P. Wimberley, on the briefs, for defendant-appellee Alejandro Lazo, D.C.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

Following a jury trial, plaintiff-appellant Nobuo Miyamoto (Nobuo) appeals from the March 5, 2001 final judgment of the Circuit Court of the Second Circuit, the Honorable Joseph E. Cardoza presiding, in favor of defendants-appellees Kenneth W. Lum, Sr. and Alejandro Lazo, D.C. (Dr. Lazo) (collectively, the defendants) in this negligence action. Nobuo also appeals from the May 7, 2001 order denying his motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial [hereinafter, motion for new trial]. Briefly stated, this case arises out of an automobile collision involving Nobuo, his wife, and Lum, as well as Dr. Lazo's subsequent chiropractic treatment of Nobuo.

On appeal, Nobuo contends that the trial court erred in: (1) denying his motion for new trial; (2) refusing to utilize one of his proposed jury instructions; (3) denying in part his motion for judgment as a matter of law; and (4) denying a motion in limine. We agree with Nobuo that the trial court erred in denying his motion for new trial as against

Lum and refusing to utilize a jury instruction that was applicable only to Lum, but we disagree with his remaining contentions. Therefore, we vacate in part both the order denying Nobuo's motion for new trial and the judgment with respect to all of Nobuo's claims against Lum and remand this case for a new trial as against Lum. The order and judgment are affirmed in all other aspects.

## I. BACKGROUND

### A. Factual History [1]

This action arises out of two negligence claims. The first claim of negligence resulted from a motor vehicle collision on October 20, 1996 in Wailuku, Maui, in which Lum's vehicle struck Nobuo's vehicle. The second claim of negligence arises out of Dr. Lazo's chiropractic treatments of Nobuo.

Nobuo was seventy-nine years old at the time of the automobile accident. Prior to the accident, Nobuo had had several medical conditions, including cardiovascular and gastroenterological problems for which he was being treated by several physicians. He also had a history of two heart bypass surgeries, one in 1977 and one in 1985, and was taking multiple medications, including Coumadin, an anticoagulant or blood thinner. On October 2, 1996, a few weeks before the accident, Nobuo had visited his family physician, Nolan Arruda, M.D. (Dr. Arruda), with complaints of pain in his left shoulder that had persisted for two months. Dr. Arruda diagnosed the pain as "arthritic in nature."

On October 20, 1996, Nobuo was driving his truck on Market Street, a one-way street, in the proper direction with his wife as a passenger. Lum, who has always lived on Kaua'i, was on Maui for his grandson's birthday and was unfamiliar with the area. Lum proceeded in the wrong direction on Market Street and struck Nobuo's truck on the pas-

senger side. Upon impact, Nobuo's wife bumped Nobuo's right side, and Nobuo's left shoulder hit the left door panel of the truck. Lum later stipulated that his actions that day were negligent.[2]

Nobuo declined treatment at the scene, but later that day he had increasing pain in his left shoulder and right ribs and received medical treatment at the Maui Medical Group. Radiologist Bruce S. Lepolstat, M.D. noted that one of Nobuo's right ribs was fractured.

Nobuo first sought treatment from Dr. Lazo two days later, on October 22, 1996, for pain in his left shoulder. Nobuo indicated on forms he filled out at Dr. Lazo's office that he had not suffered from pain to his left shoulder before and indicated that he had no physical complaints prior to the accident. Dr. Lazo testified that he did not inquire about any other medical conditions because Nobuo had indicated on the forms that he did not suffer from any other conditions.

Dr. Lazo testified that he examined Nobuo and diagnosed him with cervicobrachial syndrome, cervical neuritis, thoracic sprain/strain, and shoulder sprain/strain. Dr. Lazo testified and his reports showed that his treatment of Nobuo included the use of an activator, trigger-point therapy (thumb pressure), chiropractic adjustments, electrical stimulation, manual traction, mechanical traction, moist heat, and myofacial release. Dr. Lazo treated Nobuo nearly every three days until December 20, 1996.

On Friday, December 20, 1996, while Dr. Lazo was massaging Nobuo's left shoulder area with his thumbs, Nobuo informed Dr. Lazo that the massage was painful, but Dr. Lazo did not stop. When Nobuo left Dr. Lazo's office, he felt "all right," but Nobuo testified that he later felt nauseated and had

---

1. Facts pertaining to specific issues challenged in this appeal are discussed in more detail in the Discussion section, infra.

2. The stipulation agreement provides:
 [All of the parties], by and through their respective undersigned attorneys, hereby stipulate and agree as follows:
 1. [Lum] admits that, on October 20, 1996, he was negligent in the operation of his motor

vehicle which negligence caused the collision between his 1992 Plymouth Voyager and [Nobuo]'s 1993 Dodge Ram truck.
 2. [Lum] reserves the right to contest the nature and extent of [Nobuo's] injuries and damages, the causation thereof, and all claims against [Dr. Lazo].
 (Emphases added.)

a "funny feeling"—he thought he was getting sick. He noticed a "small little lump," the size of a "quarter or dime," on his left shoulder that was red and painful. Nobuo testified that it was "pound[ing]" and prevented him from sleeping that night. The next morning, the lump was the size of a half-dollar, and Nobuo "felt more sick." On Sunday, the lump was the size of a baseball, and Nobuo testified that he could not move his neck. On Monday, December 23, 1996, at his regularly scheduled appointment with Dr. Lazo, Nobuo informed him of the lump. At that time, Dr. Lazo inquired as to any medications Nobuo was taking, and Nobuo told him that he was taking Coumadin.

Nobuo immediately visited Dr. Arruda, who referred him to Jeffrey H. Kaplan, M.D. A computed tomography scan (*i.e.*, CT scan) was performed, which showed that Nobuo's lump was "a huge hematoma with a combination of [bloody] fluid and solid components." Later that day, Nobuo was admitted to Maui Memorial Hospital for treatment of his hematoma. Dr. Arruda's "working diagnosis" was that the hematoma was "partially secondary to localized [chiropractic] therapy and manipulation coupled with [Coumadin] anticoagulation." Thomas Nickles, M.D. (Dr. Nickles), a neurologist, similarly noted in his "Consultation Record" that he believed the hematoma was caused by chiropractic treatment and Coumadin. The hematoma was eventually lanced and "dark bloody/serous fluid" was drained. After the draining, Nobuo's left hand became numb, and it was still numb at the time of trial in 2001.

At trial, with respect to the cause of the hematoma, the defendants focused on the possibility of spontaneous bleeding, arguing that Nobuo's blood was so thin that internal bleeding resulted in the formation of a hematoma. Dr. Arruda testified that Nobuo had had a "chronic-anticoagulation" problem with his heart, for which he was taking Coumadin to prevent further coagulation. Dr. Arruda explained that a patient's dosage of Coumadin must be carefully monitored because, on the one hand, if blood clots too easily, a blood

clot could form and enter the heart or lungs, but on the other hand, if blood does not clot at all, spontaneous bleeding can occur anywhere in the body. Dr. Arruda also explained that Coumadin dosage is monitored through various blood tests, called "prothrombin time" (PT), which measures the length of time for blood to clot, and "international normalization ratio" (INR), which "indicates a level of thinness of the blood." Dr. Arruda further explained that Coumadin causes the blood to thin and that, in turn, PT and INR values will increase, which can result in spontaneous bleeding.

Dr. Arruda testified that Nobuo's PT and INR levels were monitored throughout August, September, and October 1996. Because Nobuo's levels had normalized and were stable in October 1996, Dr. Arruda advised Nobuo to return for his next blood test in three months, at the end of January 1997. However, blood tests were taken on December 23, 1996, when Nobuo was hospitalized for his hematoma. On that day, Nobuo's PT and INR levels were substantially high.[3] Dr. Arruda testified that such elevated PT and INR values could result in spontaneous bleeding.

On December 25, 1998, more than two years after the accident, Nobuo was admitted to the Maui Memorial Hospital for chest pain, which was later diagnosed as a "stress attack." Nobuo testified that he had experienced a similar stress attack prior to the accident, but he did not have another attack until December 1998. Nobuo testified that he believed that the stress attack in 1998 resulted from the stress of taking care of his bedridden wife. However, one of Nobuo's medical experts, Charles Salzberg, M.D. (Dr. Salzberg), testified that the chest pain resulted from "stress and anxiety as a direct complication of [the October 20, 1996] motor vehicle accident."

B. *Procedural History*

Jury trial commenced on January 8, 2001.[4] On January 12, 2001, Nobuo filed a motion in limine, requesting, *inter alia*, that the trial

---

3. The "normal" desired range for one's PT level is 11.0 to 13.0 and the desired range for one's INR level is 2.0 to 3.0. On December 23, 1996, Nobuo's PT level was at 39.1 and his INR level was at 11.4.

4. Nobuo's wife was initially a plaintiff in this case, but on August 11, 2000, the parties stipu-

court preclude the defendants from submitting evidence that Nobuo's hematoma could have been caused by spontaneous bleeding. After a hearing on the matter, the trial court denied the motion on this issue and ruled that "[t]he parties are allowed to explore with the medical witnesses whether a spontaneous bleed was the cause of [Nobuo's] hematoma."

On February 2, 2001, at the close of evidence, Nobuo moved for judgment as a matter of law, arguing, *inter alia*, that Lum's actions were the legal cause of Nobuo's medical expenses. The trial court denied the motion as to this issue.

That same day, the jury returned a special verdict, in which it determined that Lum's admitted negligence was *not* the legal cause of Nobuo's injuries, but it attributed $18,446.00 in general and special damages to Lum.[5] The jury found that Dr. Lazo was not negligent. On March 5, 2001, the trial court entered judgment in favor of Lum and Dr. Lazo.

On March 15, 2001, Nobuo filed a motion for new trial. Nobuo's motion for new trial was directed at both Lum and Dr. Lazo. As against Lum, Nobuo argued, *inter alia*, that the verdict was irreconcilably inconsistent and that the verdict in favor of Lum was against the manifest weight of the evidence. As against Dr. Lazo, Nobuo argued, *inter alia*, that the verdict in favor of Dr. Lazo was against the manifest weight of the evidence and that Nobuo was prejudiced when one of his own medical experts recanted his medical opinions during trial. The trial court denied Nobuo's motion on May 7, 2001.

On May 18, 2001, Nobuo timely filed his notice of appeal.

## II. STANDARDS OF REVIEW

### A. Motion for New Trial

 "Both the grant and the denial of a motion for new trial is within the trial court's

discretion, and we will not reverse that decision absent a clear abuse of discretion." *Carr v. Strode*, 79 Hawai'i 475, 488, 904 P.2d 489, 502 (1995) (citing *Richardson v. Sport Shinko (Waikīkī Corp.)*, 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994); *Stahl v. Balsara*, 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978)). "An abuse of discretion occurs 'where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.'" *Id.* (quoting *Amfac, Inc. v. Waikīkī Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992)).

### B. Jury Instructions

 When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Tabieros v. Clark Equip. Co.*, 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997) (quoting *State v. Arceo*, 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996), and citing *Craft v. Peebles*, 78 Hawai'i 287, 302, 893 P.2d 138, 153 (1995); *Montalvo v. Lapez*, 77 Hawai'i 282, 286, 884 P.2d 345, 349 (1994)).

### C. Motion for Judgment as a Matter of Law

 It is well settled that a trial court's rulings on motions for judgment as a matter of law [6] are reviewed *de novo*. *In re Estate of Herbert*, 90 Hawai'i 443, 454, 979 P.2d 39,

---

lated that all of her claims be dismissed with prejudice.

**5.** As discussed more fully *infra*, the special verdict form instructed the jury to determine the amount of damages attributable to Lum irrespective of whether the jury found his actions to be the legal cause of Nobuo's injuries.

**6.** "Pursuant to Hawai'i Rules of Civil Procedure ... Rule 50, a directed verdict is now titled 'Judgment as a Matter of Law' effective January 1, 2000." *Hac v. Univ. of Hawai'i*, 102 Hawai'i 92, 98 n. 10, 73 P.3d 46, 52 n. 10 (2003).

50 (1999) (citing *Lee v. Aiu*, 85 Hawai'i 19, 30, 936 P.2d 655, 666 (1997)).

When we review the granting of a [motion for judgment as a matter of law], we apply the same standard as the trial court. *Lussier v. Mau–Van Dev., Inc.*, 4 Haw. App. 359, 372, 667 P.2d 804, 815 (1983).

A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

*Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983) (quoting *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 77, 470 P.2d 240, 244 (1970) (citations omitted)).

*Weinberg v. Mauch*, 78 Hawai'i 40, 49–50, 890 P.2d 277, 286–87, *reconsideration denied*, 78 Hawai'i 421, 895 P.2d 172 (1995) (brackets in original). *See also Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996); *Carr v. Strode*, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995).

*Tabieros*, 85 Hawai'i at 350, 944 P.2d at 1293 (brackets omitted).

D. *Motion in Limine*

 "The granting or denying of a motion in limine ... is reviewed for abuse of discretion." *Hac*, 102 Hawai'i at 103, 73 P.3d at 57 (internal quotation marks, citations, and brackets omitted). "The denial of a motion in limine, in itself, is not reversible error. The harm, if any, occurs when the evidence is improperly admitted at trial." *Lussier*, 4 Haw.App. at 393, 667 P.2d at 826 (citations omitted). "Thus, even if the trial court abused its discretion in denying [a party]'s motion, the real test is not in the disposition of the motion but in the admission of evidence at trial." *Id.*

E. *Expert Testimony*

 "[T]he admissibility of expert testimony is reviewed for abuse of discretion." *Craft*, 78 Hawai'i at 301, 893 P.2d at 152 (citing *Yap v. Controlled Parasailing of Honolulu, Inc.*, 76 Hawai'i 248, 254, 873 P.2d 1321, 1327 (1994); *State v. Matias*, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992)).

## III. DISCUSSION

A. *The Trial Court Erred In Denying Nobuo's Motion For New Trial on the Basis That the Special Verdict Was Irreconcilably Inconsistent.*

Nobuo argues on appeal that the trial court erred in denying his motion for new trial on four grounds. With respect to Lum, he contends that: (1) the special verdict's finding that Lum was not the legal cause of Nobuo's injuries was inconsistent with the award of $18,446 in damages; and (2) the special verdict finding that Lum's actions were not the legal cause of Nobuo's injuries was against the manifest weight of the evidence. With respect to Dr. Lazo, Nobuo maintains that: (3) the verdict in favor of Dr. Lazo was against the manifest weight of the evidence; and (4) Nobuo was prejudiced when one of his medical experts recanted his medical opinions at trial. We agree with Nobuo's first contention.

### 1. A New Trial Against Lum is Warranted Because the Jury Delivered an Irreconcilably Inconsistent Verdict.

On appeal, Nobuo argues that a new trial is required inasmuch as "[t]he [s]pecial [v]erdict contains inconsistent answers which are irreconcilable with respect to whether LUM was a legal cause of injuries and damages suffered by NOBUO." Specifically, Nobuo claims that the answers to Questions 1, 6, and 8 of the special verdict are inconsistent. The jury answered the special verdict as follows:

The jury must answer all of the questions, unless otherwise indicated.... Answer the questions in numerical order. Follow all directions carefully.... If you do not understand any question or if you wish to communicate with the Court on any other subject, you must do so in writing through the Bailiff.

Question No. 1. **[Lum] has admitted he was negligent. Was such negligence a legal cause of injuries to [Nobuo]?**
[Answer "Yes" or "No" in the space provided.]
Answer: Yes No X

[Go to Question No. 2.]
Question No. 2. **Was [Dr. Lazo] negligent?**
[Answer "Yes" or "No" in the space provided.]
Answer: Yes No X

[If you have answered Question No. 2 "yes", then go on to answer Question No. 3. If you have answered Question No. 2 "No", go on to Question No. 6.]
....

Question No. 6. **State [Nobuo]'s damages attributable to [Lum].** Do not reduce the damages due to a condition, if any, which pre-existed the October 20, 1996 accident.

a. Special damages for medical expenses $ 2424.00

b. Special damages for wage loss $ 4522.00

c. General damages $11,500.00 [7]

[Go to Question No. 7.]
Question No. 7. Did [Nobuo] have a condition pre-existing the accident of October 20, 1996 from which he had not fully recovered?
Answer: Yes X No

[If you have answered Question No. 7 "Yes", then go on to answer Question No. 8. If you have answered Question No. 7 "No", then go on to answer Question No. 9.]
Question No. 8. **What is your approximation of the percentage of [Nobuo]'s present condition caused by his pre-existing condition, if any, and the October 20, 1996 accident?** If you find any pre-existing condition did not contribute to [Nobuo]'s present condition, enter a zero next to "Pre-existing condition".

Pre-existing condition 75%

**October 20, 1996 (Auto Accident)** 25%

TOTAL 100%

....

(Bold emphases added.)

■ This court has held that "[a] conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory." *Carr*, 79 Hawai'i at 489, 904 P.2d at 504. "The theory, however, must be supported by the trial court's instructions to the jury." *Id.* (citing *Toner v. Lederle Laboratories, Div. of American Cyanamid Co.*, 828 F.2d 510, 512 (9th Cir.1987)). Answers to a special verdict "are to be construed in the context of the surrounding circumstances and in connection with the pleadings, instructions, and issues submitted." *Dunbar v. Thompson*, 79 Hawai'i 306, 312, 901 P.2d 1285, 1291 (App.1995) (internal quotation marks and citation omitted).

The Intermediate Court of Appeals has adopted the following test in determining whether an irreconcilable conflict exists:

*The court must consider each of the answers claimed to be in conflict, disregarding the alleged conflicting answer but taking into consideration all of the rest of the verdict, and if, so considered, one of the*

7. It should be noted that, in closing argument, Nobuo's counsel requested $41,209.99 in special damages for medical expenses and $4522.00 for wage loss. It appears that Nobuo's counsel did not suggest an amount to be awarded for general damages.

*answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant, then the answers are fatally in conflict.* It is essential that the party seeking to set aside a verdict on the ground of conflict must be able to point out that one of the conflicting answers of the jury, in connection with the rest of the verdict except the issue with which it conflicts, necessarily requires the entry of a judgment different from that which the court has entered.

*Id.* (quoting *Vieau v. City & County of Honolulu*, 3 Haw.App. 492, 499, 653 P.2d 1161, 1166 (1982) (citation omitted)) (brackets omitted) (emphasis added).

■■■ Applying *Dunbar* to the present case, we believe that, if the answers to Questions 6 and 8 are ignored, we are left with a verdict finding that Lum's actions were *not* the legal cause of Nobuo's injuries; thus, Lum would prevail. However, if the answer to Question 1 is ignored, we are left with a verdict finding that Lum's actions contributed twenty-five percent to Nobuo's "present condition," amounting to $18,446 in damages;

thus, Nobuo would prevail.[8] Inasmuch as ignoring the answer to Question 1 "requires the entry of a judgment different from that which the court has entered"—*i.e.*, that Nobuo rather than Lum would prevail—the verdict is irreconcilably inconsistent. *See Vieau*, 3 Haw.App. at 499–500, 653 P.2d at 1166.

Moreover, our review of the record indicates that the jury instructions conflicted with the instructions on the special verdict form and misled the jury. Whereas the jury instructions indicated that the jury should determine the amount of damages only if it found legal causation,[9] the special verdict form required that the jury determine the amount of damages attributable to Lum, even if it did not find legal causation.[10] Thus, the instructions to the jury in the special verdict form were erroneous. *See Knodle v. Waikīkī Gateway Hotel, Inc.*, 69 Haw. 376, 383–84, 742 P.2d 377, 382–83 (1987) (noting that a trial court is under the duty to ensure that a jury will not be misled by the jury instructions and the special verdict form); Hawai'i Rules of Civil Procedure (HRCP) Rule 49(a) (2000).[11] Accordingly,

---

8. The trial court apparently ignored the answers to Questions 6 and 8 by entering judgment in favor of Lum.

9. For example, we note the following jury instructions:

Instruction No. *12*
... Therefore, the only questions which you must decide are:
1. Was defendant [Lum]'s conduct a legal cause of injury to plaintiffs?
2. *If so*, what amount of damages, if any, are plaintiffs entitled to as compensation for that injury?
....
Instruction No. *25*
... *If you find that at least one defendant was negligent and such negligence was a legal cause of the injuries* and/or damages, you must determine the total amount of plaintiffs' damages....
....
Instruction No. *38*
*If you find for plaintiffs on the issue of liability*, plaintiffs are entitled to damages....
(Emphases added.)

10. As previously indicated, the special verdict form required the jury to determine the amount of damages attributable to Lum irrespective of whether the jury found his actions to be the legal

cause of Nobuo's injuries. The special verdict form stated, "The jury must answer all of the questions, unless otherwise indicated"; the special verdict form did not "otherwise indicate" that the jury should refrain from awarding damages in the event that it did not find legal causation on Lum's part.

11. HRCP Rule 49(a) provides:

**Special Verdicts.** The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding;

considering the special verdict form and the surrounding circumstances, we are compelled to conclude that the jury's answers to the special verdict form regarding Lum's liability were irreconcilably inconsistent. Therefore, a new trial is warranted.

 We note that it is within our discretion to limit the issues to be decided on remand. *Myers v. S. Seas Corp.,* 10 Haw. App. 331, 351, 871 P.2d 1235, 1245 (1992); *Kojima v. Uyeda,* 2 Haw.App. 172, 175, 628 P.2d 208, 211 (1981). In the present case, because Lum admitted that his actions were negligent, the only issues before the jury regarding Lum were causation and damages. Because (1) the jury's inconsistent findings concerned both causation and damages, (2) the jury instructions conflicted with the instructions on the special verdict form, and (3) one of the jury instructions regarding damages was erroneous, *see infra* Section III.B., we hold that the issues of causation and damages are not "sufficiently separate" to warrant limiting the new trial to only one of the issues. *See Myers,* 10 Haw.App. at 351, 871 P.2d at 1245. Therefore, on remand, the new trial shall address both causation and damages as to Lum.[12]

**2. The Trial Court Did Not Err in Denying Nobuo's Motion for New Trial As Against Dr. Lazo.**

In his motion for new trial, Nobuo also claimed that a new trial regarding Dr. Lazo was warranted inasmuch as (1) the verdict in favor of Dr. Lazo was "clearly against the weight of the evidence as to amount to a manifest miscarriage of justice" and (2) No-

buo was prejudiced when his own medical expert, Dr. Salzberg, recanted his medical opinions during trial. Nobuo reasserts these arguments on appeal.[13]

a. *the verdict in favor of Dr. Lazo was not against the manifest weight of the evidence.*

On appeal, Nobuo contends that the trial court erred in denying his motion for new trial as against Dr. Lazo inasmuch as the "manifest weight of the evidence supports the conclusion that [Dr. Lazo] was negligent and that such negligence was the legal cause of injuries and damages suffered by [Nobuo]." We disagree.

Hawai'i Revised Statutes § 635–56 (1993) permits a court to grant a new trial "when [the verdict] appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury[.]" In *Petersen v. City & County of Honolulu,* 53 Haw. 440, 441, 496 P.2d 4, 6, *reh'g denied,* 53 Haw. 449, 496 P.2d 4 (1972), we noted that a new trial could be granted "if each party has introduced enough evidence to make a jury case, but one party's evidence clearly outweighs the other party's evidence[.]"

 In the present case, Nobuo sought to show that Dr. Lazo's chiropractic treatment on December 20, 1996 caused Nobuo's hematoma, whereas the defendants sought to prove that the hematoma was caused by a spontaneous bleed. We believe that the evidence presented before the trial court was

---

or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.
(Bold emphasis in original.)

**12.** In light of our determination that a new trial against Lum is warranted based on the irreconcilable verdict form, we need not address Nobuo's other argument against Lum with respect to his motion for a new trial.

**13.** In his opening brief, Nobuo also contends that the trial court erred in denying his motion for new trial as against Dr. Lazo because Dr. Salzberg "engag[ed] in ex parte discussions with [Dr. Lazo]'s counsel[.]" However, Nobuo did not assert this argument before the trial court and,

therefore, he has waived this argument on appeal. *See Ass'n of Apartment Owners of Wailea Elua v. Wailea Resort Co.,* 100 Hawai'i 97, 107, 58 P.3d 608, 618 (2002) ("[l]egal issues not raised in the trial court are ordinarily deemed waived on appeal).

Even if this court were to address this issue, the only evidence in the record of any ex parte communication is from *defense counsel's* bare disclosure to the trial court that Dr. Salzberg had called him on a Saturday. Without more, we could only speculate as to whether the communication in fact occurred and, assuming it did occur, only speculate as to the substance of the communication. Thus, the record on appeal is insufficient to review this issue raised for the first time on appeal.

evenly balanced. In other words, we cannot say that Nobuo's evidence clearly outweighed Dr. Lazo's evidence such that a new trial is warranted.

First, with respect to the cause of the hematoma itself, Nobuo adduced testimony, depositions, and/or medical reports by Drs. Arruda, Salzberg, and Nickles tending to prove that the hematoma was caused by a combination of chiropractic manipulation and anticoagulation, or blood thinness. On the other hand, Dr. Lazo adduced evidence tending to prove that Nobuo's PT and INR levels were nearly normal in the weeks prior to the hematoma's formation, but that on December 23, 1996, when Nobuo first sought treatment for the hematoma, his blood tests indicated abnormally high PT and INR levels. Dr. Arruda testified that those levels could result in spontaneous bleeding.

Nobuo also sought to show that the hematoma developed precisely where Dr. Lazo had treated him. Although Nobuo testified that Dr. Lazo massaged him generally in the neck, shoulder, and back areas and that the hematoma developed "roughly around that area," Dr. Lazo testified that he did not apply treatment to the area where the hematoma eventually developed. Dr. Salzberg also testified that the lack of bruising in the area where the hematoma developed was "an incongruent finding" with Nobuo's assertion that Dr. Lazo's treatment caused the hematoma inasmuch as there should have been bruising in the area if chiropractic treatment caused the hematoma.

Moreover, the parties' evidence conflicted as to precisely when the hematoma first emerged. Nobuo sought to show a temporal connection between Dr. Lazo's treatment and the hematoma's formation—*i.e.*, that the hematoma developed soon after Dr. Lazo's treatment. Nobuo testified that he first noticed the hematoma on Friday, December 20,

1996, the last day of Dr. Lazo's treatment, but Drs. Arruda and Lazo testified that Nobuo had told them that his "lump" began swelling on Sunday.

 This court is extremely reluctant to reverse a trial judge's assessment of the evidence. *Petersen*, 53 Haw. at 442, 496 P.2d at 6. "[A trial court's] conclusion that a verdict is not against the weight of the evidence is sustained unless we are of the opinion that the undisputed evidence results in a verdict that is without legal support such that justice requires a new trial[.]" *Id.* at 442, 496 P.2d at 6–7 (internal quotation marks, ellipses points, citation, and brackets omitted). Inasmuch as the record evinces that evenly balanced evidence was submitted as to (1) the cause of the hematoma, (2) the area where Dr. Lazo treated Nobuo on December 20, 1996, and (3) when the hematoma first emerged, we hold that the trial court did not abuse its discretion in denying Nobuo's motion for new trial on the ground that the verdict in favor of Dr. Lazo was against the manifest weight of the evidence.

b. *Dr. Salzberg's recanting of his medical opinion does not warrant a new trial.*

Prior to trial, Nobuo retained Dr. Salzberg as a medical expert witness. On April 1, 1999 and June 4, 1999, Dr. Salzberg created two medical reports documenting his medical opinions regarding Nobuo's condition. The April 1, 1999 report does not appear to be in the record on appeal,[14] but based on Nobuo's motion for new trial, Dr. Salzberg apparently opined in that report that the hematoma was caused by Dr. Lazo's chiropractic manipulations. However, in his June 4, 1999 report and at his June 12, 2000 deposition,[15] Dr. Salzberg indicated that spontaneous bleeding could have been a factor in causing the hematoma as indicated by Nobuo's high PT and INR levels.

14. None of the parties direct us to the April 1, 1999 report's location in the record on appeal, and we will not sift through ten volumes of records to find the report. *Int'l Bhd. of Elec. Workers, Local 1357 v. Hawai'ian Tel. Co.*, 68 Haw. 316, 333, 713 P.2d 943, 956 (1986) ("an appellate court is not required to sift through a voluminous record for documentation of a party's contentions").

15. At the June 12, 2000 deposition, counsel for Nobuo and Lum did not attend, but Dr. Lazo forwarded the deposition transcript to Nobuo's counsel. The parties subsequently stipulated that the deposition would not be used as evidence in the case.

On January 11, 2001, Nobuo called Dr. Salzberg to testify at trial, but his full testimony could not be taken because he had "a commitment to several patients this afternoon that he couldn't change." The final portion of his testimony was taken via deposition on January 24, 2001 at his medical office on the Big Island. At this deposition, it became clear that Dr. Salzberg was recanting his prior medical opinions as stated in his April 1, 1999 report in light of new information that was subsequently made available to him:

[W]hen I did this [April 1, 1999] report and formulated these opinions, it was based largely on the history taken from [Nobuo] and the review of records.

One of the primary things that I relied upon was [Nobuo]'s history, that *he underwent a manipulation. And to me that meant ... high velocity, high amplitude manipulation.*

*Subsequently in the review of the depositions*[16] that I have seen prior to trial testimony, *it's been apparent that that, in fact, is not what historically has been documented as having occurred; that apparently, the chiropractic intervention included an activator technique as well as trigger point injections. And therefore, my documented written opinions of April[,] 1–1999 are now subsequently altered because of some of this new information that I have become aware of.*

(Emphases added.)[17] After discussing Nobuo's "high Coumadin values" and the possibility of spontaneous bleeding, Dr. Salzberg stated:

This guy could be bleeding to death. Had this hematoma not come up when it did, he could have died, quite honestly. *What caused this hematoma? In looking at all this stuff, I cannot say with certainty what caused the hematoma.*

(Emphasis added.)[18]

On January 29, 2001, Nobuo filed a motion in limine requesting that the court limit Dr. Salzberg's medical opinions only to those which were "described previously in his reports." The trial court denied Nobuo's motion as untimely, but reminded the parties of its pretrial order limiting expert testimony to opinions that were disclosed prior to the "discovery cutoff" date. The parties determined which portions of Dr. Salzberg's testimony violated that pretrial order and read the remaining portions of his testimony to the jury. Thus, the jury did not hear any testimony concerning Dr. Salzberg's change in opinion or his new opinions, if any.

After the jury returned a verdict in favor of Dr. Lazo, Nobuo moved for new trial, arguing that he was prejudiced by Dr. Salzberg's recantation, which the trial court denied. On appeal, Nobuo reasserts that he "was prejudiced by a medical expert that he specifically retained to assist his claims against [Dr. Lazo] who betrayed him at the last minute for the apparent purpose of assisting his opponent." We disagree.

■ Nobuo has not shown how he was prejudiced.[19] Nobuo was aware of Dr. Salzberg's concerns regarding spontaneous bleeding prior to trial inasmuch as Dr. Salzberg indicated such concerns in his June 4, 1999 report and at his June 12, 2000 deposition. Furthermore, the trial court precluded the parties from reading into evidence any of Dr. Salzberg's opinions which were not disclosed by the "discovery cutoff" date, pursuant to a pretrial order. In doing so, the court excluded Dr. Salzberg's testimony regarding any change of his medical opinions. Moreover, evidence showing the causal relationship between Dr. Lazo's treatment and the hematoma, the opinion to which Nobuo had expected that Dr. Salzberg would testify, was adduced through Dr. Arruda's testimony and Dr. Nickles' report. Therefore, because any prejudicial testimony by Dr. Salzberg was precluded by the court, we hold that the

16. The trial court had ruled that all of Nobuo's experts, other than Dr. Pleiss, may refer to certain depositions.

17. This portion of Dr. Salzberg's deposition was not read to the jury.

18. This portion of Dr. Salzberg's deposition was not read to the jury.

19. We note that, without the April 1, 1999 report in the record on appeal, Nobuo cannot rely on it in claiming that he was prejudiced.

trial court did not abuse its discretion in denying Nobuo's motion for new trial on this ground.

Based on the foregoing, we hold that the trial court erred in denying Nobuo's motion for new trial only as to Lum, and, because Nobuo's claims against Lum and Dr. Lazo are "sufficiently separate," we limit the new trial to Nobuo's claims against Lum. *See Myers,* 10 Haw.App. at 351, 871 P.2d at 1245. We next address Nobuo's remaining contentions on appeal to provide guidance on remand.

B. *The Trial Court's Jury Instructions Were Erroneous.*

The trial court did not utilize Nobuo's Proposed Jury Instruction Number 2 [hereinafter, proposed jury instruction], which was fashioned after *Gibo v. City & County of Honolulu,* 51 Haw. 299, 302, 459 P.2d 198, 200 (1969). The proposed jury instruction provided:

> *Where a defendant's negligence causes injuries to a plaintiff* and, because of the weakened or impaired physical condition, plaintiff suffers subsequent injuries, which are not brought about by the negligence of the plaintiff, or any efficient intervening cause, *defendant's negligence is deemed to be the legal cause of both the original and subsequent injuries.*

(Emphases added.) Instead, the jury was given Jury Instruction Number 41:

> If you find that [Lum] is liable for an injury to [Nobuo], *he is also liable for any aggravation of such injury or additional injury caused by* **negligent** *chiropractic treatment* or care of such injury.

(Emphases added.)

On appeal, Nobuo contends that, based on *Gibo,* Jury Instruction Number 41 was erroneous because, although it instructed the jury that a defendant can be liable for injuries resulting from *negligent* medical treatment, it failed to instruct that a defendant can also be liable for injuries caused by *non-*

*negligent* medical treatment. In *Gibo,* this court stated the general rule regarding liability for subsequent injuries not directly caused by a defendant:

> The general rule is that a defendant is liable in damages to a plaintiff for all injuries proximately caused [ [20]] by his negligence. Then, *where a defendant's negligence causes injuries to a plaintiff and because of the weakened or impaired physical condition plaintiff suffers subsequent injuries, which are not brought about by the negligence of plaintiff, or any efficient intervening cause, defendant's negligence is deemed to be the proximate cause of both the original and subsequent injuries.*
>
> However, where plaintiff's subsequent injuries are brought about by plaintiff's negligence, defendant is only liable for the original injuries, as proximate cause of defendant's negligence. This result may be reached under the theory of avoidable consequences, that is, plaintiff by the use of reasonable care could have avoided the subsequent fall and the injuries and damages that resulted. Or under the doctrine that the negligence of defendant was not the proximate cause of the second fall and the consequent injuries and damages because the negligence of plaintiff was an efficient intervening cause.

*Gibo,* 51 Haw. at 302–03, 459 P.2d at 200–01 (emphasis added) (citations omitted).

However, relying on *Montalvo,* Lum argues that Jury Instruction Number 41 was not erroneous. In *Montalvo,* this court was faced with the narrow issue of whether a plaintiff could recover for injuries resulting from *negligent* medical treatment. 77 Hawai'i at 300, 884 P.2d at 363. Therein, the appellant challenged the validity of the following jury instruction: "If you find that the defendants are liable for an injury to the plaintiff, they are also liable for any aggravation of such injury or additional injury caused by *negligent* medical or hospital treatment or case [sic] of such injury." *Id.* (emphasis

---

**20.** We note that the term "legal cause" should be used instead of "proximate cause" when instructing juries, although both terms are synonymous. *Montalvo v. Lapez,* 77 Hawai'i 282, 287 n. 5, 884 P.2d 345, 350 n. 5 (1994) (citing *Knodle,*

69 Haw. at 389, 742 P.2d at 386); *Taylor–Rice v. State,* 91 Hawai'i 60, 69 n. 6, 979 P.2d 1086, 1095 n. 6 (1999) (expressing preference of the phrase "legal cause" over "proximate cause").

added). In determining whether the instruction was erroneous, we applied the *Gibo* rule and held that the jury instruction "state[d] the black-letter law that negligent medical treatment is a foreseeable result of an injury." *Id.* In no way did we limit foreseeability *only* to negligent *medical* treatment; *non-negligent* treatment, *i.e.,* medically appropriate treatment, is also a foreseeable result of injury. Thus, a defendant can be held liable for injuries resulting from both negligent and non-negligent medical treatment.

■ In this case, Nobuo sought recovery for injuries and damages—the hematoma, numbness in his left arm and hand, and related hospital bills—allegedly resulting from Dr. Lazo's medical treatment. If Dr. Lazo's treatment—whether negligent or appropriate—caused any aggravation of the accident-related injuries or a new injury, *Gibo* provides that Lum may be liable for those injuries. However, Jury Instruction Number 41 limited Nobuo's recovery to negligent medical treatment only and denied Nobuo the possibility of recovering for such aggravation or new injury resulting from non-negligent medical treatment. Accordingly, we believe that, under the circumstances of this case, Jury Instruction Number 41 was too narrow and thus erroneous.

C. *The Trial Court Did Not Err in Denying Nobuo's Motion for Judgment as a Matter of Law.*

■ At the close of evidence and pursuant to HRCP Rule 50(a) (2000),[21] Nobuo moved for judgment as a matter of law arguing, *inter alia,* that Lum was the legal cause of Nobuo's medical expenses. The trial court denied Nobuo's motion. On appeal, Nobuo reasserts his original argument and raises two new ones. Specifically, Nobuo contends that his motion should have been granted

because "uncontroverted evidence" supports his argument that (1) Lum's actions were the legal cause of his medical expenses, (2) Lum's actions were the legal cause of Nobuo's hospitalization for stress and anxiety in December 1998, and (3) Nobuo's medical expenses were reasonable, appropriate, and necessary. Inasmuch as Nobuo did not raise the two latter grounds before the trial court, we deem them waived on appeal. *Ass'n of Apartment Owners of Wailea Elua,* 100 Hawai'i at 107, 58 P.3d at 618 ("[l]egal issues not raised in the trial court are ordinarily deemed waived on appeal"). With respect to Nobuo's first ground, we hold that the trial court did not err in denying Nobuo's motion for judgment as a matter of law based thereon.

[A] motion for [judgment as a matter of law] asks the trial court to rule that the movant's opponent has introduced so little evidence to support a verdict in his favor that the case does not raise a jury question. The motion tests the sufficiency of the evidence to create a jury question. *If there is any substantial evidence which might support a verdict for each side, the case should be submitted to the jury.*

*Petersen,* 53 Haw. at 441, 496 P.2d at 6 (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969)) (emphasis added). Judgment as a matter of law is proper where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue[.]" HRCP 50(a).

■ Nobuo argues that judgment as a matter of law should have been entered inasmuch as Lum's actions caused Nobuo's necessity for (1) chiropractic treatment by Dr. Lazo and (2) hospitalization for a "stress attack" in 1998. First, with respect to Nobuo's chiropractic treatment by Dr. Lazo (viewing the evidence in the light most favorable to Lum), evidence supported a finding

---

21. HRCP Rule 50(a) provides:
 **Judgment as a Matter of Law.**
 (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be

maintained or defeated without a favorable finding on that issue.
 (2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.
(Bold emphasis in original.)

that Nobuo's left shoulder pain, for which he sought chiropractic treatment, could have been caused by pre-existing arthritic injuries. On October 2, 1996, a few weeks prior to the accident, Nobuo had visited with Dr. Arruda with complaints of pain in his left shoulder that had persisted for two months. Dr. Arruda diagnosed the pain as "arthritic in nature."

Moreover, Nobuo testified that, during the accident, he injured the "same place" on his left shoulder as where he had experienced arthritic pain prior to the accident. Nobuo also testified that the pain he experienced during December 1996 was still in the "same place" as where his pre-accident pain had occurred. Dr. Arruda similarly testified that the pain that Nobuo experienced in December 1996 was in the same area as where he had arthritis. Dr. Arruda also testified that arthritis is a degenerative joint disease that can occur without trauma. The sum of this evidence supports Lum's theory that Nobuo's left shoulder pain, for which he sought chiropractic treatment, could have been caused by his pre-existing arthritis, instead of the car accident.

Second, with respect to Nobuo's hospitalization for his December 1998 "stress attack," evidence showed that it could have been caused by factors other than the car accident. On December 25, 1998, Nobuo was hospitalized for chest pain. As for the cause of his chest pain, which was later diagnosed as a "stress attack," very little evidence was adduced by either party. Nobuo testified that he had experienced a similar stress attack prior to the car accident. He also testified that he had not experienced another stress attack until December 1998, more than two years after the accident. Most importantly, Nobuo testified that he believed several factors caused his stress attack:

> Well, as I have told you, you know, *I take care of my wife,* so, you know, every night I'm just—*I am thinking of what to do and what not to do,* and you know, *all those things compound,* so that was the—it was—what you call, the stress, a stress attack, yeah.

(Emphases added.)

Accordingly, viewing the evidence in the light most favorable to Lum, we hold that substantial evidence supported a verdict for either side regarding legal causation of the chiropractic treatments by Dr. Lazo and the hospitalization in 1998 and, therefore, this issue was properly submitted to the jury.

### D. The Trial Court Did Not Err in Denying Nobuo's Motion in Limine.

On January 12, 2001, the fifth day of trial, Nobuo filed a motion in limine, requesting, *inter alia,* that the trial court restrict or preclude the defendants from proffering evidence, eliciting testimony, or discussing the possibility that Nobuo's hematoma was caused by a spontaneous bleed. Nobuo based this request on his assertion that "[t]he general consensus among the medical doctors is that NOBUO's hematoma was caused by the chiropractic therapy" and "no medical opinions based upon reasonable medical probability ... [show] that the hematoma was due to a spontaneous bleed." (Emphases omitted.) On January 26, 2001, after a hearing on the matter, the trial court denied Nobuo's motion on this issue and ruled that "[t]he parties are allowed to explore with the medical witnesses whether a spontaneous bleed was the cause of [Nobuo's] hematoma[.]"

On appeal, Nobuo contends that the trial court erred in denying his motion in limine on this issue. He argues that, because the defendants did not "provide expert medical testimony establishing that a spontaneous bleed was the legal cause of NOBUO's hematoma," he was prejudiced by their argument that the hematoma could have been caused by spontaneous bleeding. We disagree.

It is well-settled that, in any negligence action, the plaintiff—not the defendant—has the burden of proving the requisite elements, including legal causation. *See, e.g., Carr,* 79 Hawai'i at 485 n. 6, 904 P.2d at 499 n. 6; *Craft,* 78 Hawai'i at 298, 893 P.2d at 149; *Nielsen v. Am. Honda Motor Co.,* 92 Hawai'i 180, 190, 989 P.2d 264, 274 (App. 1999). In so doing, the plaintiff may solicit opinions from medical experts, but such medical opinions "must be grounded upon reasonable medical probability as opposed to a

mere possibility because possibilities are endless in the field of medicine." *Craft,* 78 Hawai'i at 305, 893 P.2d at 156 (citing *Duff v. Yelin,* 721 S.W.2d 365 (Tex.App.1986). However, the plaintiff's medical expert may be cross-examined as to "(1) the witness' qualifications, (2) the subject to which the witness' expert testimony relates, and (3) the matter upon which the witness' opinion is based and the reasons for the witness' opinion," Hawai'i Rules of Evidence (HRE) Rule 702.1(a) (1993), as well as "the underlying facts or data [of the medical opinion]." HRE Rule 705 (1993). After all, "[e]xpert testimony is not conclusive and like any testimony, the jury may accept or reject it." *Bachran v. Morishige,* 52 Haw. 61, 67, 469 P.2d 808, 812 (1970) (citations omitted).

■■■ In the present case, Dr. Arruda specifically opined on direct-examination that, based upon reasonable medical probability, the hematoma was not caused by a spontaneous bleed. Specifically, Dr. Arruda testified:

Q. [By Nobuo's counsel] Doctor, in terms of your examination and care of [Nobuo], did you form any impression as to whether a spontaneous bleed was responsible for the development of the hematoma?

A. [By Dr. Arruda] *I did not think that his hematoma was a result of his spontaneous bleed, no.*

Q. And, Doctor, *was that thought and professional opinion based upon reasonable medical probability?*

A. *Yes.*

(Emphases added.) On cross-examination, counsel for Dr. Lazo extensively questioned Dr. Arruda about the basis of his opinion, the reasons for his opinion, and the underlying facts and data of his medical opinion, as permitted by HRE Rules 702.1(a) and 705. In response, Dr. Arruda conceded that Nobuo's anticoagulation, or thinness of his blood, was "greater than desired" and that such increased anticoagulation could result in spontaneous bleeding. Dr. Arruda also admitted that the spontaneous bleeding could occur anywhere in the body.

Thus, Dr. Lazo's cross-examination of Dr. Arruda was proper. Accordingly, we hold

that the trial court did not abuse its discretion in denying Nobuo's motion in limine.

## IV. *CONCLUSION*

In light of the above discussion, we vacate in part both the March 5, 2001 judgment and the May 7, 2001 order denying Nobuo's motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial. We vacate the judgment with respect to Nobuo's claims against Lum, and we vacate the order with respect to the denial of Nobuo's motion for new trial as against Lum. In all other respects, we affirm the judgment and order. Accordingly, we remand this case for new trial against Lum on the issues of causation and damages.