**Electronically Filed
Supreme Court
SCWC-30683
17-MAR-2014
02:56 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STACEY COSTALES,
Respondent/Plaintiff-Appellant/Cross-Appellee,

vs.

SCOTT ROSETE, in his official and individual capacity,
Petitioner/Defendant-Appellee/Cross-Appellant,

and

MELVIN ANDO, in his official and individual capacity;
GLENN YOSHIMOTO, in his official and individual capacity;
STATE OF HAWAI'I; DEPARTMENT OF HUMAN SERVICES;
OFFICE OF YOUTH SERVICES,
Petitioners/Defendants-Appellees/Cross-Appellants,

and

JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE
CORPORATIONS 1-10; and DOE ENTITIES 1-10, Defendants.

_____

SCWC-30683

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 30683; CIV. NO. 07-1-2360)

MARCH 17, 2014

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND POLLACK, JJ.[1]

AMENDED OPINION OF THE COURT BY McKENNA, J.

## I.    Introduction

In this appeal, a youth correctional officer ("YCO") found liable for sexual assault against a ward seeks review of the ICA's Judgment on Appeal, entered pursuant to its Memorandum Opinion, which remanded this case for a new trial limited to the issue of allocation of fault and damages, due to an irreconcilable conflict in the jury's special verdict answers. Costales v. Rosete, No. 30683 (App. May 30, 2012) (mem.) at 21. The YCO seeks a completely new trial without limitation on the basis that he was prejudiced by the admission of evidence of his State co-defendants' bad acts.  He also seeks to preclude judgment against him in his individual capacity based upon Hawaiʻi Revised Statutes ("HRS") § 662-10 (1993)'s "judgment bar," which states, "The judgment in an action [against the State under the State Tort Liability Act] shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the State whose act or omission gave rise to the claim."

---

[1]    Associate Justice Acoba, who heard oral argument and signed the opinion filed on February 27, 2014, retired on February 28, 2014.

We hold that the ICA was correct in limiting the issues on re-trial to the allocation of fault and damages, but it should have further limited the damages issues to be re-tried to the measure of general and special damages each defendant should pay, with the jury properly instructed on when each defendant can be held liable in his individual (versus official) capacity. We also hold that in this case HRS § 662-10 does not bar contemporaneous judgments against the State and against Rosete in his individual capacity.

We therefore vacate the ICA's Judgment on Appeal, entered pursuant to its Memorandum Opinion, and affirm the circuit court's order granting Rosete a new trial, with the issues limited on re-trial in a manner consistent with this opinion.

## II. Background

### A. Complaint and Answer

On December 13, 2007, Plaintiff Stacey Costales filed her Complaint against Scott Rosete (a YCO at Hawai'i Youth Correctional Facility, or "HYCF"), in his individual and official capacities, Melvin Ando (a former HYCF administrator), in his individual and official capacities, Glenn Yoshimoto (a former HYCF correction supervisor), in his individual and official capacities, the State of Hawai'i, Department of Human Services ("DHS"), and the Office of Youth Services ("OYS"). Count One of the Complaint alleged Assault and Battery, as against Rosete.

Costales alleged that Rosete took her out of her cell and sexually assaulted her in 2002 while she was a minor ward detained at HYCF.

Count Two of the Complaint alleged Negligence, as against the State, OYS, DHS, Yoshimoto, and Ando for failing to protect Costales from harm.  Specifically, Costales alleged negligent hiring, supervision, and retention of Rosete; negligent failure to properly train the HYCF YCOs, including Rosete; negligent failure to properly and thoroughly investigate assaults and batteries committed by HYCF YCOs, including Rosete; negligent failure to adequately reprimand YCOs, including Rosete, to prevent them from harming other wards or from working at HYCF; negligent management of HYCF; and negligent and unreasonable failure to adopt and implement policies and procedures to supervise and care for wards detained at HYCF in order to prevent assaults and batteries against wards.  Costales alleged that Ando and Yoshimoto were not protected by qualified immunity because these defendants acted with malice and/or for an improper purpose.  Costales further alleged that these defendants endorsed a pattern or practice of conduct that created an unreasonably dangerous condition at HYCF.

Count Three of the Complaint alleged Intentional and Negligent Infliction of Emotional Distress by each of the defendants.  Count Four of the Complaint sought punitive damages

against Rosete, Ando, and Yoshimoto. Costales prayed for
general, compensatory, and special damages in an amount to be
proven at trial; punitive damages; pre- and post-judgment
interest; and such other and further relief as the court deemed
just and equitable.

Rosete then filed his Answer to Plaintiff's Complaint,
denying the allegations contained in the First, Second, and Third
Claims. He also raised HRS § 662-10 as a defense, arguing that
Costales was barred "from obtaining judgment against both the
State of Hawai'i (including any State agency, employee, or
official, in an official capacity) and Defendant Rosete."

**B. Trial**

Rosete, in his individual capacity, was tried along with the
rest of the defendants. Rosete, in his individual capacity, was
tried by a jury. The jury was advisory as to the remaining
defendants.

**1. Testimony of Former Wards**

At trial, Costales called as witnesses three former wards
who were residing at HYCF at the time of the alleged assault.
Each testified that Rosete was physically and verbally abusive.
One ward testified that Rosete had discussed sex with her and
sexually touched her as well. The former wards testified that
the other YCOs saw Rosete's behavior but did nothing about it.
They also testified that they did not report Rosete because they

were scared of him, and Rosete would boast that nothing would happen to him if they reported him anyway.

The former wards also testified that for months, Rosete and another YCO would bring out certain girls (including Costales) at night, paper over the windows to the girls' dorm so the other wards would not see what was happening, give the girls food and cigarettes, receive massages, and sleep while the girls punched their time cards.

Regarding whether Rosete allegedly sexually assaulted Costales, one former ward testified that Costales had returned from being taken out one night and was "crying and said she was scared, she didn't know what to do." The former ward testified that Costales told her Rosete "had sex. He put it in two times and then pulled out." Another former ward testified that on the night of the alleged sexual assault, Costales looked scared and begged her to stay up all night with her, telling her in incomplete sentences only such information as, "[Rosete] took me to [an isolation room]. There was a mattress." Costales stopped short of full disclosure to this former ward.

### 2. Testimony of Carl Imakyure

Costales also called Carl Imakyure, a Children and Youth Specialist V with the Office of Youth Services, a division within the State of Hawaii's Department of Human Services. He testified that late 2004 or early 2005, he was asked to conduct a "systems

investigation into HYCF," in other words, to look at "regular patterns of behavior pertaining . . . to programs, staff training, any incidents of neglect or abuse, anything that would seem to be consistent over at the HYCF," with a focus on Yoshimoto's contribution to the institutional culture. The relevant time frame for Imakyure's systems investigation was from 2000 or 2001 up to 2003 or 2004, but he looked at data from 1999 to 2003.

Imakyure's report concluded that there was a "lack of training" at HYCF, that Yoshimoto had a difficult time disciplining the staff such that "there was a continuing pattern of abuse by staff by particular YCOs," and that "the YCOs did not have the kind of close oversight and supervision needed at that time to ensure the safety and the care of these youths." Imakyure testified that he concluded in his report that Yoshimoto was grossly negligent. He also acknowledged that his report questioned whether Yoshimoto possessed compassion for the youth at HYCF. Imakyure testified that he did not recall coming across any information in his investigation concerning Rosete. The record does not reflect that Rosete requested a limiting instruction during Imakyure's testimony (or during the final charge to the jury).

### 3. Testimony of Harold Fitchett

Costales called Harold Fitchett, an investigator with the Attorney General's office, whom Ando asked to investigate Rosete's rumored sex assault of Costales.  Fitchett tape-recorded his interview with Costales, which took place on June 7, 2002.  On the recording, Costales explained that Rosete committed misconduct of a sexual nature "four or five times" in January or February 2002, shortly before she was released from HYCF.  Costales stated that Rosete and another YCO would remove her and another ward from their dormitory during the first shift, and the two girls would punch the time clock for the YCOs.  She stated that the first time Rosete sexually assaulted her, she was lying on a couch in the staff area, Rosete laid next to her, and "was fingering [her] on top of the [couch]" and "pulling [her] pants and doing whatever to [her]."  She stated that Rosete told her to be quiet and that she was scared, so she did not say anything.  Costales stated that Rosete also "fondl[ed her] breast and stuff . . . with his hands."  Costales stated that, although she was not physically hurt, she was scared because Rosete had beaten up other wards in the past.

Costales stated that the second incident of sexual assault happened two or three days after the first and was similar to the first.  Costales stated that the third incident consisted of "nothing physical," but "sexual comments."  Rosete told her he "want[ed] to fuck [her] brains out," and that they "look[ed]

8

sexy." Costales stated that, by the time the fourth incident came around, she was "just fucken losing it" because she was scared of Rosete and what would happen next. She stated that Rosete came into her cell that night, "laid on [her] bed with [her] and covered [her] mouth. And he was just, like, kissing [her] neck, kissing [her] ear." Costales said she started crying and asking Rosete why he was doing this to her, and Rosete covered her mouth and told her to "shut up." At that point, a timer bell went off, and Rosete left Costales' cell to punch the clock. When he returned, he removed Costales from her cell and took her to an isolation room in the back of the dorm. Costales stated that Rosete "laid [her] down on the mattress in the back of the dorms and he was fingering [her] once again, um, just kissing [her] . . . doing things with [her]. . . And then he tried to shove his [penis] in [her]. . . . . And when he shoved it in, he shoved it in." Rosete stopped because he heard a noise and went to check on it. In the meantime, Costales returned to her cell, washed herself off, and another ward asked her what happened. When Rosete returned, he called her a "fucken[] bitch" and stated that she "ruined it all" because he "wanted to do things to [her]."

Costales also told Fitchett that another YCO had sexually assaulted one ward and physically assaulted other wards, including Costales. Fitchett further testified that he was

9

directed by the union representing the HYCF YCOs to destroy all the records of his investigations into the abuses at HYCF.

#### 4. Testimony of Linda Hadley

Costales called Linda Hadley, a former nurse and administrator at HYCF. She testified that she told a senate committee about "[v]erbal abuse, physical abuse. . .[,] sexual abuse," and the "lack of concern by administration to provide the safety that was needed for the kids" at HYCF. Hadley testified to the lack of training or supervision of the YCOs. Hadley was familiar with Rosete and characterized him as a "very authoritative person" who "[l]ike[d] to have control over the kids." Hadley did not know that Costales had been assaulted. The record does not reflect that Rosete requested a limiting instruction at the time of Hadley's testimony (or during the final charge to the jury).

#### 5. Testimony of Lia Olione

Lia Olione, an HYCF YCO, had his deposition testimony read into evidence after he invoked his Fifth Amendment right against self-incrimination and was declared unavailable. The circuit court allowed portions of his deposition in another HYCF guard-on-ward sexual assault case to be read to the jury[2] as relevant to the other defendants' notice, over Rosete's objection that the

---

[2] That deposition testimony was not transcribed by the court reporter, even though this court required such transcription in Roxas v. Marcos, 89 Hawaiʻi 91, 100 n.2, 969 P.2d 1209, 1218 n.2 (1998).

testimony violated Hawai'i Rules of Evidence ("HRE") Rules 401, 402, 403, 404, 602, and 802, and that he was not noticed for the deposition.  Relevant to Rosete's appeal, Olione testified to the following:

> -- He received no training, including how to deal with adolescents, when he was hired by HYCF.
> --  He did not believe he and the other YCOs were adequately supervised by their immediate superiors or by Ando and Yoshimoto.
> -- He slept on the job because "[n]obody check[ed] on [him]."
> -- He opined, "I don't think anybody checks on anybody in that facility."  He opined that "[e]verybody was doing as they see fit," including supervisors.
> -- A female ward told him that YCOs were having sex with female wards.  Although he knew such contact was prohibited, he did not report it to Ando or Yoshimoto because "[t]he whole facility was out of control . . . Nobody was doing anything."
> -- He agreed that YCOs verbally abused the wards and that this abuse went unreported to Ando or Yoshimoto.
> -- Abusive YCOs were allowed to keep their positions and continue their verbally, physically, and/or sexually abusive behavior.
> -- He agreed that the YCOs -– not the HYCF administration –- were in control and that the resulting atmosphere was one of desperation and terror for the wards.
> -- There was a "lack of discipline . . . almost to the point where we [YCOs] [we]re encouraged to do wrong since there [wa]s no discipline, and no close supervision. . . ."

### 6.  Testimony of Glenn Yoshimoto

Costales called Glenn Yoshimoto, who testified that a YCO accused of sexually harassing a ward continued to work at HYCF "until he went to prison."  Because the parties acknowledged that Yoshimoto opened the door[3] regarding YCO Lia Olione's conviction for sexual assault, the parties agreed with the circuit court to

---

[3]     Evidence of other lawsuits against the State, particularly Ruiz v. State of Hawaii, et al., Civil No. 04-1-1739-09 (KSSA), which arose from a 2003 alleged sex assault of a ward by Olione, had been previously excluded by an order granting in part and denying in part one of the State's motions in limine.

11

stipulate to the fact of conviction.  The stipulation read to the

jury was as follows:

> The parties in this case through their lawyers have stipulated to certain facts and you must consider those facts as having been conclusively proved.
> The facts that they have stipulated to are that Mr. Olione was found guilty of and stated the following:
>> On June 15, 2003, while employed at a State correctional facility I had sexual intercourse and   inserted my finger into the vagina of SM . . . an inmate/ward of the correctional facility.
>> I also touched the breasts of inmate[/]ward SM a person less than 16 but at least fourteen who was more than five years younger than myself and to whom I was not married.
>> In June 2003 I recklessly threatened SM by word or conduct on more than one occasion for the same purpose.

In fact, Rosete wanted the jury to know that it was Olione who

was convicted of sex assault, lest the jury believe that the

incident involved Rosete.  Rosete did not request a limiting

instruction at the time of the stipulation, and the record does

not reflect that he requested a limiting instruction as part of

the jury's final charge.

When Yoshimoto's testimony resumed, Plaintiff's counsel

questioned him about the destruction of ward complaints; YCO-on-

ward verbal, physical, and sexual abuse; and Costales' own

grievances about being beaten by another YCO (not Rosete) and

being placed in isolation with insufficient food and sleep time.

Yoshimoto alternately denied the incidents happened, denied

knowledge or recollection of these incidents, disclaimed

responsibility for those incidents that occurred while sub-

contractors ran the HYCF school, justified the incidents as reasonable use of force, or asserted that verbal abuse at HYCF was too pervasive to reduce or eliminate.  Rosete did not request a limiting instruction at the time of Yoshimoto's testimony, and the record does not reflect that he requested a limiting instruction as part of the jury's final charge.

### 7.  Testimony of Scott Rosete

Costales also called Rosete, then a YCO supervisor on paid leave from HYCF, to testify.  His testimony regarding the time period of the alleged sexual assaults follows:

> Q [by Costales' counsel]:  Did you ever take [Costales] out of her dorm at night?
> A [by Rosete]:  I'm sure I did.
> Q:  Did you ever take any other girls out of their dorms at night?
> A:  Yes, I have.
> Q:  And, during those times did you allow them to punch the clock?
> A:  No, ma'am.
> Q:  During the nights when you took [Costales] out of her room, you allowed her to watch TV, right?
> A:  My answer would be yes, but, I would have to explain myself though.  When we take them out, the T.V.'s already on because that's what we're doing, we're watching TV.  And, -- and, we'd be taking out wards for numerous reasons.  If they come out -- out of the dorm, they're in the living room area where the T.V's at I'm sure that they would be watching.
> Q:  And, you do this during the time when they're supposed to be locked up and in their dorm and sleeping, right?
> A:  Yes, ma'am.
> Q:  And, you would give her candies and cigarettes during these nights; isn't that correct?
> A:  That's not true.
> Q:  And you would make her massage your feet during these nights; is that correct?
> A:  That is not correct.
> Q:  And, did you not talk dirty to her during these nights?
> A:  That is absolutely not true.
> Q:  Did you not tell her that she was sexy?
> A:  No.
> Q:  Did you ever -- did you not tell her that you wanted to fuck her brains out.
> A:  I did not.

13

Q:  And, did you not touch her in a sexual way?
A:  No, ma'am.
Q:  Did you sexually assault[] Stacey Costales with your fingers?
A:  No.
Q:  Did you sexually assault[] her with your penis?
A:  Negative.

## 8.  Testimony of Stacey Costales

Costales also took the stand.  She testified that wards feared Rosete because he had physically abused her and other wards.  She testified that she and other wards did not report the physical abuse because nothing would have been done about it.  She testified that Rosete would boast that all he would get was a "slap on the wrist" if any of the wards reported his behavior.  Costales also testified that Rosete called the wards "bitches" and "sluts."  He would often humiliate the wards by making them wear "I'm stupid" signs and by making them bark like dogs for their food.

She testified that she began to trust Rosete after he started counseling her and taking her out of her dorm at night to give her candy, Zippy's food, and cigarettes.  She testified that she punched the time clock for Rosete, massaged his feet, made toast for him, and grabbed mattresses from the isolation rooms for him.  She testified that after Rosete befriended her, he "started doing things to [her]," including touching her breasts and vagina twice, before having sexual intercourse with her.  He also told Costales she was "sexy" and that he "want[ed] to fuck

14

[her] brains out." She elaborated that the night Rosete had sex with her, he had asked her to bring him a mattress from an isolation room; when Costales was in the isolation room, Rosete followed her and pushed her onto the mattress, "got on top of [her], pulled [her] clothes off and put himself inside of [her]." He stopped because he heard something and went to check it out.

### 9. Testimony of Susan Thain

Portions of the deposition testimony of retired HYCF teacher Susan Thain were read to the jury after Thain was declared unavailable. Thain testified that she was not aware that Costales was sexually assaulted, but she testified that she knew two other wards were raped. She testified that other YCOs were having what she surmised to be a sexual relationship with another ward, based on the ward's statements to her. That same ward was also talked into stripping down by another YCO, who told her he wanted to use her as a clothing model. Thain testified that, in general the YCOs would often "swat [a] girl on the butt" or make passing comments she considered inappropriate.

Thain testified that she witnessed YCOs physically beating the wards, once to the point where a ward became unconscious. She testified that when she reported the abuse, the YCOs would harass and threaten her, and she believed her car was vandalized by one of them.

### C. Jury Instructions, Special Verdict Form, Findings of Fact and Conclusions of Law, and Final Judgment

Relevant to this appeal, the only instruction on the difference between official and individual capacity was the following:

> If a State employee is found liable in his official capacity, then the State is responsible.
> If a State employee is found liable in his individual capacity, then that State employee is personally responsible.

Also relevant to this appeal, the circuit court charged the jury with the following instructions concerning separating each defendant's rights:

> Similarly, each defendant in this case has separate and distinct rights. You must decide the case of each defendant separately, as if it were a separate lawsuit. Unless I tell you otherwise, these instructions apply to all the defendants.

The jury entered its answers on the special verdict form as follows:

> **QUESTION No. 1:**
>
> Did Scott Rosete sexually assault Plaintiff Stacey Costales?
>
> Yes _X_ (12)        No ___
>
> If you answered "Yes", proceed to Question No. 2. If you answered "No", proceed to the end of this form, date and sign it, and then call the Bailiff.
>
> **QUESTION No. 2:**
>
> Was Scott Rosete's sexual assault a legal cause of Plaintiff Stacey Costales' injury?
>
> Yes _X_ (12)        No ___
>
> If you answered "Yes", proceed to Question No. 3. If you answered "No", proceed to the end of his [sic] form, date and sign it, and then call the Bailiff.

16

**QUESTION NO. 3:**

Before December 12, 2005, did Stacey Costales discover, or reasonably should have discovered, that she was psychologically or emotionally injured by Defendant Rosete's sexual assaults?

Yes \_\_\_      No \_X\_ (12)

If you answered "Yes", proceed to the end of this form, date and sign it, and then call the Bailiff.  If you answered "No", proceed to Question No. 4

**QUESTION NO. 4:**

Was Melvin Ando negligent?

Yes \_X\_ (12)      No \_\_\_

If you answered "Yes", proceed to Question No. 5.  If you answered "No", proceed to Question No. 6.

**QUESTION NO. 5:**

Was the negligence of Melvin Ando a legal cause of Plaintiff Stacey Costales' injury?

Yes \_X\_ (12)      No \_\_\_

Proceed to Question No. 6.

**QUESTION NO. 6:**

Was Glenn Yoshimoto negligent?

Yes \_X\_ (12)      No \_\_\_

If you answered "Yes", proceed to Question No. 7.  If you answered "No", proceed to Question No. 8.

**QUESTION NO. 7:**

Was the negligence of Glenn Yoshimoto a legal cause of Plaintiff Stacey Costales' injury?

Yes \_X\_ (12)      No \_\_\_

Proceed to Question No. 8.

**QUESTION NO. 8:**

Was the State of Hawaii (or any of its agencies including the Department of Human Services and/or the Office of Youth Services) negligent?

Yes \_X\_ (12)      No \_\_\_

If you answered "Yes", proceed to Question No. 9. If you answered "No", proceed to Question No. 10.

**QUESTION NO. 9:**

Was the negligence of the State of Hawaii (or any of its agencies including the Department of Human Services and/or the Office of Youth Services), a legal cause of Plaintiff Stacey Costales' injury?

       Yes _X_ (12)     No ___

Proceed to Question No. 10.

**QUESTION NO. 10:**

If you have found one or more of the parties above at fault, and that its or his actions were a legal cause of Plaintiff Stacey Costales' injury, for each party, enter the percentage of fault you attribute to that party. Please note that the total of the percentages must equal 100%.

```
Scott Rosete              62%
Melvin Ando               9%
Glenn Yoshimoto           15%
State of Hawaii
     (Department of Human Services and/or the Office
     of Youth Services) 14%
TOTAL                     100%
```

**QUESTION NO. 11 – (Special Damages)**

Without regard to any possible apportionment of her damages, what is the total amount of Plaintiff Stacey Costales' special damages?

```
1) Scott Rosete
Official Capacity $_____
Individual Capacity    $67,000 (12)
2) Melvin Ando
Official Capacity $_____
Individual Capacity $_____
3) Glenn Yoshimoto
Official Capacity $_____
Individual Capacity $_____
4) State of Hawaii      $_____
(Department of
Human Services and/or
The Office of Youth Services)
TOTAL                   $67,000
```

**QUESTION NO. 12 – (General Damages)**

Without regard to any possible appointment [sic] of her damages, what is the total amount of Plaintiff Stacey Costales' general damages?

18

```
1) Scott Rosete
     Official Capacity        $200,000 (12)
     Individual Capacity      $200,000 (12)
2) Melvin Ando
     Official Capacity        $100,000 (12)
     Individual Capacity      $50,000 (12)
3) Glenn Yoshimoto
     Official Capacity        $150,000 (11)
     Individual Capacity      $150,000 (11)
4) State of Hawaii            $300,000 (12)
     (Department of Human
     Services and/or the Office
     Of Youth Services)
TOTAL                         $1,150,000
```

**QUESTION NO. 13:**

What percentage of Plaintiff Stacey Costales' damages, if any, is attributable to any of the following:
a. Pre-existing Injury/Condition ___%
b. January/February 2002 Incidents 75%
c. Subsequent injury/condition 25%
TOTAL (Note: The total must equal 100%) 100%

**QUESTION No. [14] – (Punitive Damages)**

What is the total amount of any punitive damages that Plaintiff Stacey Costales should receive from each Defendant?

Scott Rosete $300,000
Melvin Ando $_____
Glenn Yoshimoto $_____
TOTAL $300,000

The jury's answers closely tracked Costales' request for damages in her closing argument:  "For Mr. Rosete, we're asking $600,000. $300,000 for compensation, $300,000 for punitive damages. . . . The State?  $300,000.  Mr. Ando?  $300,000.  Mr. Yoshimoto? Same.  Because they're equally responsible. . . .  And for future care and psychotherapy, $67,000.  This is the total of one million five sixty-seven."  In closing, Costales also asserted that 75% of her depression resulted from Rosete's sexual assault.

The circuit court filed its Findings of Fact and Conclusions

of Law, which adopted the jury's special verdict findings as to Rosete, in his individual capacity, and adopted the advisory jury's special verdict findings as to the remaining defendants.

The circuit court entered final judgment as follows:

> With respect to Claim I of Plaintiff's Complaint, relating to Plaintiff's claim of assault and battery against Defendant Scott Rosete, Judgment is hereby entered in favor of Plaintiff Stacey Costales and against Defendant Scott Rosete.
> With respect to Claim II of Plaintiff's Complaint, relating to Plaintiff's claim of negligence, Judgment is hereby entered in favor of Plaintiff Stacey Costales and against Defendants State of Hawaii, Office of Youth Services, Department of Human Services, Melvin Ando and Glenn Yoshimoto.
> With respect to Claim III of Plaintiff's Complaint, relating to Plaintiff's claim of intentional and negligent infliction of emotional distress, Judgment is hereby entered in favor of Plaintiff Stacey Costales and against Defendants Scott Rosete, State of Hawaii, Office of Youth Services, Department of Human Services, Melvin Ando and Glenn Yoshimoto.
> With respect to Claim IV of Plaintiff's Complaint, relating to Plaintiff's claim for punitive damages, Judgment is hereby entered in favor of Plaintiff Stacey Costales and against Defendant Scott Rosete in the amount of $300,000.00.
> Without regard to any apportionment, Plaintiff Stacey[] Costales' special damages are $67,000 and her general damages are $1,150,000.00.
> Without regard to any apportionment, Plaintiff's total special, general and punitive damages are $1,517,000,000. [sic]
> Applying the 25% apportionment for Plaintiff's subsequent injury/condition, Plaintiff Stacey Costales' combined special and general damages are $912,750.00.
> Pursuant to the Court's February 9, 2010 Order Granting in Part and Denying in Part Plaintiff's Motion for Taxation of Costs and Pre-Judgment Interest, Plaintiff Stacey Costales is entitled to costs in the amount of $12,438.27 against Defendants, except $1,993.19 of which is not taxable against Defendant Scott Rosete in his individual capacity; Plaintiff is not entitled to pre-judgment interest.
> Judgment in Plaintiff Stacey Costales' favor, and against all Defendants, is hereby entered in the total amount of $1,225,188.27.
> All remaining parties or issues to this case are dismissed.

### D. Post-Trial Motions[4]

Rosete moved for judgment as a matter of law or, alternatively, for a new trial.  Rosete argued that the "torrent of evidence . . . with regard to alleged abuses by others" at HYCF should have been excluded as to Rosete as more prejudicial than probative.  Rosete also argued that the special verdict form was inconsistent and confusing.  Rosete then argued that Costales could not take judgment against both Rosete and the State, citing HRS § 662-10, which states, "The judgment in an action under this chapter shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the State whose act or omission gave rise to the claim."

The circuit court issued its Order Granting in Part and Denying in Part Defendant Rosete's, in his Individual Capacity, Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial.  The motion was granted as to Rosete's request for a new trial and denied as to his motion for judgment as a matter of law.  The only basis for the new trial was the irreconcilable conflict in the jury's answers to special verdict question numbers 10 and 12:  "The court finds that an irreconcilable

---

[4]     Effective January 28, 2010, Judge Marks' previously assigned civil cases were transferred and reassigned to Judge Rhonda Nishimura.  Judge Marks presided over the trial in this case; Judge Nishimura presided over the bulk of the post-trial motions in this case.

21

conflict exists between the jury's answers in the percentage allocation of fault amongst the defendants and the monetary damages allocated amongst the defendants."

Costales moved for reconsideration of the circuit court's order. Costales included as "new evidence" declarations from nine jurors[5] stating that they intended to award Costales the dollar amounts assigned to all defendants in question number 12 of the special verdict and that the percentages of fault allocated in question number 10 did not control. Alternatively, Costales argued that if a new trial were unavoidable, the issues upon re-trial should be limited to the allocation of general damages among the defendants, as the defendants did not dispute that they were 100% at fault and that the total damages were $1,150,000.00. The circuit court denied Costales' motion for reconsideration.[6]

**E. ICA Appeal**

This appeal reached the ICA on the circuit court's order granting Costales' Motion for Interlocutory Appeal of the order granting Rosete, in his individual capacity, a new trial, and the order denying her motion for reconsideration of that order.

---

[5] Costales later filed similar declarations from two more jurors.

[6] The trial court left it to the appellate courts to consider the juror declarations. The ICA concluded (and we agree) that the juror declarations concerned the jurors' intent; therefore, the circuit court properly declined to consider the declarations because they were barred under HRE Rule 606. Costales, mem. op. at 17-18.

Rosete, in his individual capacity, filed a cross-appeal, raising as points of error the circuit court's admission of the other defendants' bad acts, the circuit court's failure to grant Rosete a new trial on the additional basis of prejudice from these bad acts, and HRS § 662-10's judgment bar.

In Costales' answering brief, she counter-argued, "The Trial Court was correct in admitting evidence of prior physical and sexual abuse of other HYCF wards by Defendants Rosete and other guards to show notice of a dangerous condition and opportunity." Costales also argued that Rosete was not prejudiced by the admission of the other defendants' bad acts because the evidence was overwhelming that Rosete sexually assaulted Costales. Further, she argued that Rosete waived his argument for failing to move for limiting instructions as to this evidence at trial. Lastly, as to Rosete's HRS § 662-10 argument, Costales counter-argued that there is no Hawai'i case law interpreting the statute, but she cited Breed v. Shaner, 57 Haw. 656, 665, 562 P.2d 436, 442 (1977), for the general proposition that Hawai'i's STLA should be liberally construed to compensate victims for the negligent conduct of State employees.

The ICA issued a Memorandum Opinion, remanding this case "for a new trial limited to the allocation of fault and damages among the defendants." Costales, mem. op. at 21. The ICA concluded that the evidence of the other defendants' bad acts was

admissible to show notice. Costales, mem. op. at 12. Further, the ICA concluded that Olione's deposition testimony concerning his sexual assault of another ward was admissible once Yoshimoto opened the door. Costales, mem. op. at 13. Moreover, the ICA concluded that all of this evidence was not unfairly prejudicial to Rosete because the circuit court instructed the jury to consider evidence against each defendant separately. Costales, mem. op. at 13.

The ICA also rejected Rosete's argument that HRS § 662-10 precluded judgment against both him and the State. Costales, mem. op. at 15. It concluded, "Plainly read, the statute precludes subsequent claims on the same subject matter, but does not bar claims against multiple defendants." Costales, mem. op. at 15 (citing Rodriguez v. Handy, 873 F.2d 814, 816 n.1 (5th Cir. 1989)).

The single issue in which the ICA concluded that the circuit court erred was in ordering a new trial without a limitation on issues, because the defendants did not dispute that their combined fault was 100%, nor did they argue that the damage award was unreasonable. Costales, mem. op. at 18. The ICA concluded, "The circuit court ignored the supreme court's conclusion in Dias [v. Vanek, 67 Haw. 114, 118, 679 P.2d 133, 136 (1984)] that the preferred remedy for such a verdict is a new trial limited to the issue of damages." Costales, mem. op. at 20 (emphasis in

original).  The ICA then remanded the case for a new trial

"limited to the allocation of fault and damages among the

defendants."  Costales, mem. op. at 21.

## III.  Standards of Review

### A.  Motion for New Trial

> Both the grant and the denial of a motion for new trial
> [are] within the trial court's discretion, and we will not
> reverse that decision absent a clear abuse of discretion.
> An abuse of discretion occurs "where the trial court has
> clearly exceeded the bounds of reason or disregarded rules
> or principles of law or practice to the substantial
> detriment of a party litigant."

State by Bronster v. U. S. Steel Corp., 82 Hawaiʻi 32, 54, 919

P.2d 294, 316 (1996) (citations omitted).  It is also within the

appellate court's discretion to limit the issues of a new trial

upon remand.  Miyamoto v. Lum, 104 Hawaiʻi 1, 10, 84 P.3d 509,

518 (2004).

### B.  Evidentiary Rulings

> [D]ifferent standards of review must be applied to trial
> court decisions regarding the admissibility of evidence,
> depending on the requirements of the particular rule of
> evidence at issue.  When application of a particular
> evidentiary rule can yield only one correct result, the
> proper standard for appellate review is the right/wrong
> standard.  Where the evidentiary ruling at issue concerns
> admissibility based upon relevance, under [Hawaiʻi Rules of
> Evidence (HRE)] Rules 401 and 402, the proper standard of
> appellate review is the right/wrong standard. . . .
> Evidentiary decisions based on HRE Rule 403, which require a
> "judgment call" on the part of the trial court, are reviewed
> for an abuse of discretion.

Tabieros v. Clark Equip. Co., 85 Hawaiʻi 336, 350-51, 944 P.2d

1279, 1293-94 (1997).

## C.    Statutory Construction

Interpretation of a statute is a question of law, which this court reviews de novo.  See Molinar v. Schweizer, 95 Hawai'i 331, 334-35, 22 P.3d 978, 981-82 (2001) (citation omitted).

## IV.    Discussion

As a preliminary matter, the circuit court and ICA properly concluded that the special verdict form was defective.  It is true that the trial court has "'complete discretion' over the type of verdict form" to use.  Montalvo v. Lapez, 77 Hawai'i 282, 292, 884 P.2d 345, 355 (1994) (citations omitted).  "When . . . the trial court 'require[s] a jury to return only a special verdict in the form of a special written finding upon each issue of fact,' HRCP 49(a)[7] compels the judge to 'give to the jury such explanation and instruction concerning the matter thus

---

[7]    Hawai'i Rules of Civil Procedure Rule 49(a) (2009) provides:
> *Special verdicts.*  The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.  In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate.  The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.  If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury.  As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

submitted as may be necessary to enable the jury to make its findings upon each issue.'" Knodle v. Waikiki Gateway Hotel, 69 Haw. 376, 383, 742 P.2d 377, 382 (1987) (footnote modified). The questions on the special verdict form, however, "may be so defective that they constitute reversible error. In analyzing alleged errors in special verdict forms, the instructions and the interrogatories on the verdict form are considered as a whole." Montalvo, 77 Hawai'i at 292, 884 P.2d at 355 (citations omitted).

In this case, the special verdict form and its accompanying jury instructions were defective. The jury instructions did not inform the jury as to the circumstances under which Rosete, Yoshimoto, and Ando would be liable in their individual versus official capacities for the general damage amounts the jury assigned in special verdict question number 12. Ordinarily, a public official is qualifiedly immune from liability. Medeiros v. Kondo, 55 Haw. 499, 505, 522 P.2d 1269, 1272 (1974). To defeat a public official's claim of qualified immunity, the burden is on the plaintiff to adduce "clear and convincing proof that [the public official] defendant was motivated by malice and not by an otherwise proper purpose." Id. "If it is determined that [the individual defendant] was acting within the scope of his employment as a public official, then he can be held liable for general, special, and punitive damages (1) if he maliciously exercised his official discretion, or (2) if he maliciously

committed a tort against plaintiffs. . . ." Kajiya v. Dep't of Water Supply, 2 Haw. App. 221, 227, 629 P.2d 635, 640 (App. 1981) (citations and footnote omitted).

"Unless the issue is removed from the case by uncontested affidavits and depositions, the existence or absence of malice is a question for the jury." Kajiya, 2 Haw. App. at 227, 629 P.2d at 640. In this case, there was no jury instruction on malice or improper purpose; therefore, when the jury assigned damage amounts to Rosete, Ando, and Yoshimoto in their individual and official capacities in special verdict question number 12, it was not informed that Costales had to meet a higher burden of proof in order to hold the individual defendants personally liable for her damages.

Second, the jury's answers to special verdict question numbers 10 and 12 were irreconcilably in conflict. "A conflict in the answers to questions in a special verdict does not automatically warrant a new trial; a new trial will be ordered only if the conflict is irreconcilable." Kalilikane v. McCravey, 69 Haw. 145, 152, 737 P.2d 862, 867 (1987) (citation omitted). Although the ICA has previously cited to Texas authority for the proposition that an irreconcilable conflict in a special verdict form exists when "one of the answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant . . . necessarily requir[ing] the entry of

28

a judgment different from that which the court has entered," we have also found an irreconcilable conflict in situations where there was no question that the judgment would be for the plaintiff. Compare Dunbar v. Thompson, 79 Hawai'i 306, 312-13, 901 P.2d 1285, 1291-92 (App. 1995) (citing Vieau v. City & County of Honolulu, 3 Haw. App. 492, 499, 653 P.2d 1161, 1166 (1982) (citing Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex, 197, 206, 222 S.W.2d 985, 991 (1949))) with Ray v. Kapiolani Med. Specialists, 125 Hawai'i 253, 261-62, 259 P.3d 569, 577-78 (2011) (observing that the jury's answers to the special verdict form were irreconcilably in conflict based on the facts of the case, where the jury found that a doctor's treatment of a plaintiff did not cause injury but found that the doctor's failure to properly inform the plaintiff did).

In this case, the special verdict form called upon the jury to assign damages in two ways: special verdict question number 10 asked the jury to assign percentages of fault for Costales' injury among all the defendants, while special verdict question number 12 asked the jury to break down general damages owed to Costales by the State and by Rosete, Ando, and Yoshimoto. The jury answered question number 12 in a manner mathematically inconsistent with their answer to question number 10. The answers to these questions were irreconcilably in conflict. Like Ray, even though the judgment for plaintiff is not at issue, the

29

jury's answers to special verdict question numbers 10 and 12 are irreconcilably in conflict because it is unclear what amount of general and special damages Rosete, Ando, and Yoshimoto owe to Costales, and in what capacity (individual or official). Therefore, a new trial is warranted.

The next section discusses the issues to be determined upon re-trial.

### A. New Trial Limited to the Allocation of Fault and Damages among the Defendants

On certiorari, Rosete argues that the ICA erred in ordering an entirely new trial limited to the allocation of fault and damages among the defendants. Further, he argues in conclusory fashion that "[t]he concept of seating a new jury merely to reallocate a prior jury's dueling verdicts is unprecedented and denies either the state an advisory jury or Mr. Rosete an actual jury verdict." In any event, he argues the new jury would have to hear all the evidence, making the ICA's remand impractical. Rosete makes plain that the primary reason he seeks a new trial is to exclude evidence heard in the first trial that he argues was unfairly prejudicial to him, an issue that is discussed in the next subsection.

In Costales' Response, she counter-argues (1) limiting re-trial to the "allocation of damages" is the preferred remedy under Dias, 67 Haw. 114, 679 P.2d 133; (2) such a limitation

promotes judicial economy and fairness, particularly in light of the fact that the defendants do not contest that they were 100% liable for Costales' injury or that the total damages awarded were reasonable; (3) the limited re-trial is a practical solution and will not require recalling many of the liability and damages witnesses; and (4) Rosete's request for a completely new trial is a thinly veiled attempt at a "second bite of the apple."

The ICA's remand of this case for a re-trial "limited to the allocation of fault and damages" is problematic. Costales, mem. op. at 21. The ICA cited Dias for the proposition that "the preferred remedy for [an irreconcilable conflict in a special verdict form] is a new trial limited to the issue of damages." Costales, mem. op. at 20 (emphasis in original). Dias, however, does not squarely address the situation in this case: an uncontested total damage award where the allocation of fault, in addition to damages, among the defendants is ambiguous.

In Dias, homebuyers (the Diases) sued homesellers (the Vaneks) for fraud, after the Vaneks previously represented that their termite inspector found no evidence of termites in the home, and after the Diases found termites in one of the walls. 67 Haw. at 115-16, 679 P.2d at 134-35. The Diases stopped making monthly payments to the Vaneks under their agreement of sale, and the Vaneks made a counterclaim against the Diases for breach of the agreement of sale. 67 Haw. at 116, 679 P.2d at 135.

The jury found, inter alia, that the Diases breached the agreement of sale and were liable to the Vaneks for $6,263.  Id. The trial court, without explanation, allowed the Vaneks to keep the down payment on the agreement of sale and ordered the Diases to pay the $6,263 in damages to the Vaneks in addition to that. Id.  The Diases appealed.  Id.

This court acknowledged that Hawaiʻi law allowed the seller to retain payments made as liquidated damages.  67 Haw. at 116-17, 679 P.2d at 135.  However, this court observed that the trial court's instruction to the jury regarding the down payment mentioned only that a rescission of the agreement of sale (which the jury did not find was warranted) would allow the Diases to get their down payment back; the instructions made no mention of what would happen to the down payment if the Diases did not succeed in rescinding the agreement of sale.  67 Haw. at 117, 679 P.2d at 135-36.  Thus, it was unclear what the jury understood would happen to the down payment, and it was unclear whether the jury's award of $2,263 accounted for the down payment or not.  67 Haw. at 118, 679 P.2d at 136.  Thus, this court held that the trial court erred in awarding the down payment to the Vaneks, further clarifying, "The preferred remedy of an ambiguous verdict is to have the jurors return to clarify the verdict.  Here, the jury had been discharged, and the only available remedy is a remand for a new trial limited to the issue of damages[.]"  Id.

This case is similar to Dias in some respects but not others. The jury's special verdict, like the verdict in Dias, was unclear, because the percentage fault in question number 10 was mathematically inconsistent with the damages breakdown in question number 12. Further, like Dias, the jury in this case had already been discharged and could not be called in to clarify the verdict.

However, all the Dias remedy speaks to is re-trial on the contested issue of damages. In this case, the total amount of damages is uncontested.[8] At no point did Rosete (or the other defendants) argue that the jury award was unreasonable or that the defendants were not collectively 100% liable to the Plaintiff. Rather, Rosete argued that the confusion in the jury's special verdict pertained to whether the percentages of fault in question number 10 control, or whether the damages breakdown in question number 12 controls. As such, Dias's remedy of a new trial limited to damages does not squarely address the ambiguity in the special verdict at bar.

Further, not all of the damages determinations are contested. Therefore, the Dias remedy, as applied to this case on remand, is not properly limited. We therefore further limit the damages issues to be re-tried to those that are contested and

---

[8]     No party disputes the jury's answers to special verdict question numbers 1, 2, 4, 5, 6, 7, 8, and 9, which establish that each defendant's actions or omissions were the legal cause of Costales' injuries.

that are "sufficiently separate" from those damages issues that are not contested on appeal. See Miyamoto, 104 Hawai'i at 10, 84 P.3d at 518 (inferring that where trial issues are "sufficiently separate," a re-trial on remand can be limited to certain issues). Not at issue on re-trial are the following determinations. First, the jury's answer to question number 14 established that Rosete is liable to Costales for $300,000 in punitive damages; there is no question that Rosete is liable in his individual capacity for punitive damages. See HRS § 662-2 (1993) ("The State hereby waives its immunity for liability for the torts of its employees . . . but shall not be liable for . . . punitive damages.") Second, the jury's answer to question number 13 established that 25% of Costales' damages can be apportioned to an injury or condition that arose subsequent to the 2002 sexual assaults; no party disputes this determination. These damage determinations shall not be re-tried upon remand. Therefore, we affirm the circuit court's Final Judgment to the extent that it awarded Costales $300,000 in punitive damages from Rosete, in his individual capacity.

In this case, due to the irreconcilable conflict in the jury's answers to special verdict question numbers 10 and 12, and due to the absence of a Medeiros jury instruction, re-trial on remand shall be limited to the allocation of liability and of general and special damages among the defendants, with an

instruction to be given to the jury regarding when a State employee can be personally liable due to malice or improper purpose.  In other words, the re-trial shall be limited to a redetermination of the allocation of fault and damages under special verdict form question numbers 10, 11, and 12.

**B.  Admission of the Other Defendants' Bad Acts**

On certiorari, Rosete argues that he is entitled to an entirely new trial, not limited to the issue of allocation of fault and damages, because he was unfairly prejudiced by the admission of the other defendants' bad acts.  Although he concedes that the bad act evidence was admissible to show notice of a dangerous condition relevant to Costales' negligence claims against the State, he argues that the jury found him "guilty by association" with the other defendants, as evidenced by the

> illogical division of damages between the <u>accused rapist</u> and <u>negligent co-defendants</u>.  By definition, an intentional tortfeasor causes more damage than those whose negligence contributed to the harm . . . but that was not the finding of this confused and angry jury,

who attributed 18% of the damage to Rosete and 82% of the damage to the other defendants.[9]  Rosete argues that the torrent of bad act evidence attributable to the other defendants roused the jury to overmastering hostility towards them, thereby distracting the jury from the question of whether Rosete committed the sexual assault against Costales.

---

[9]    This argument is disingenuous for Rosete to make; it should be in his interest to accept an 18% allocation of fault and not advocate that the jury should have found him more at fault.

In Costales' Response, she argues that Rosete's argument that he was prejudiced by the admission of the other defendants' bad acts is oversimplified; she argued that testimony simply adverse to Rosete is not prejudicial. Further, she argued that Rosete could have (1) asked for his trial to be bifurcated from the other defendants but did not; and (2) asked for a limiting instruction but did not. Moreover, she argued that the circuit court instructed the jury that "each defendant in this case has separate and distinct rights. You must decide the case of each defendant separately, as if it were a separate lawsuit." She argued that the jury was presumed to follow the court's instructions.

The ICA's disposition of the issue was proper. The record does not reflect that Rosete ever requested a limiting instruction as to evidence of the other defendants' bad acts, even after it became clear that the circuit court was admitting the evidence as relevant to the issue of their notice of a dangerous condition. HRE Rule 105 states, "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Further, the parties acknowledged that Yoshimoto opened the door regarding YCO Lia Olione's conviction for sexual assault and stipulated to

36

the fact of conviction.  In fact, Rosete wanted the jury to know that it was Olione –- not Rosete --  who was convicted of sex assault.

Moreover, even considering the allegedly adverse impact of this evidence upon Rosete's defense, it is unlikely that the jury was distracted by it in assessing whether Rosete sexually assaulted Costales, because there was a similar "torrent" of graphic testimony on that issue by Costales and her witnesses, rebutted only by Rosete's bare assertions that he did not sexually assault Costales.  With or without the admission of the bad acts of the other defendants, the jury would likely have found Rosete liable for sexually assaulting Costales.  Consequently, on certiorari, Rosete has not shown how the admission of bad acts going towards the issue of the other defendants' negligence prejudiced him.

### C.  HRS § 662-10

Rosete argues that HRS § 662-10 precludes a contemporaneous judgment against both the State of Hawai'i and Rosete in his individual capacity.  It is true that HRS § 662-10 states, "The judgment in an action under this chapter shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the State whose act or omission gave rise to the claim."  However, the provisions of Chapter 662, including HRS § 662-10's judgment bar, does not

apply to Costales' claim of assault and battery against Rosete in his individual capacity. HRS § 662-15 (Supp. 2004) states, "This chapter [Chapter 662] shall not apply to . . . [a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights. . . ." Therefore, HRS § 662-10 does not apply to bar Costales' intentional tort claim against Rosete in his individual capacity.[10]

_____

[10]   In rejecting Rosete's argument, the ICA misused federal case law interpreting 28 U.S.C. § 2676 (2006). Costales, mem. op. at 15. The ICA took a footnote from Rodriguez, 873 F.2d at 816 n.1, out of context to support its conclusion that 28 U.S.C. § 2676 (and, analogously, HRS § 662-10) bars only the subsequent judgment against an individual government employee following a judgment against the government. The complete footnote in Rodriguez reads:

> The plaintiffs contend that § 2676 is an affirmative defense which the individual defendants waived by failing to affirmatively plead it. The flaw in this argument is that § 2676 is applicable only after a plaintiff obtains a judgment against the United States. In this case the judgment against the United States was entered at the same time as the judgment against the individual. Therefore, the individual defendants could not have plead § 2676 as an affirmative defense.

873 F.2d at 816, n.1 (emphasis added). The point in the Rodriguez footnote was that 28 U.S.C. § 2676 does not bar a Bivens claim against an individual government defendant from the outset, even though the Bivens claim accompanies a Federal Tort Claims Act ("FTCA") claim, and even if the Bivens claim might later be precluded by a judgment on the FTCA claim. (A "Bivens claim" refers to the  private right of action for money damages based on constitutional violations committed by federal agents in the performance of their official duties, which was judicially created by Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).)

The ICA, however, characterized the emphasized language above as the "holding" in Rodriguez, ignoring the rest of the opinion, which held that a even contemporaneous entry of judgment on an FTCA claim bars the entry of judgment on a Bivens claim, under 28 U.S.C. § 2676. Rodriguez, 873 F.2d at 816:

> [T]he price of obtaining an FTCA judgment against the United States based on a given incident is the loss of all claims arising from that incident against the United States' agents: "The moment judgment was entered against the government, then by virtue of section 2676, [the individual
>                                                       (continued . . .)

In a case factually similar to the instant one, we held:

> [W]here the plaintiff's negligence claim seeks to hold the State liable for the conduct of state employees other than the alleged tortfeasor, pursuant to theories of negligent hiring, retention, supervision, or the like, the plaintiff's claim does not necessarily "arise out of" the hired, retained, or supervised employee's intentional tort. Rather, if the State knew, or reasonably should have anticipated, that one of its employees would commit an intentional tort against a person to whom the State owed a duty of care, <u>the State is liable for the negligence of those employees who were in a position to take reasonable precautions against the anticipated harm</u>.

Doe Parents No. 1 v. Dep't of Educ., 100 Hawai'i 34, 68, 58 P.3d 545, 579 (2002) (emphasis added). Therefore, HRS § 662-10 does not bar Costales from obtaining contemporaneous judgments from Rosete in his individual capacity and from the State. To the extent that recovery against the State is predicated on the alleged negligence of Rosete's superiors in hiring, supervising, training, and retaining him, such a claim does not involve "the same subject matter" as the intentional tort claims against Rosete.

## V. Conclusion

For the foregoing reasons, the ICA's Judgment on Appeal is vacated. The circuit court's Order Granting in Part and Denying in Part Defendant Rosete's, in his Individual Capacity, Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial is affirmed, and this case is remanded for further

---

[9] (continued . . .)
agent] was no longer answerable to [the plaintiff] for damages."
(citing Arevalo v. Woods, 811 F.2d 487, 490 (9th Cir. 1987)).

proceedings consistent with this opinion. Specifically, the circuit court shall limit the issues of the new trial to the allocation of fault and of general and special damages among the defendants, with an instruction to be given to the jury regarding when a State employee can be personally liable due to malice or improper purpose pursuant to Medeiros v. Kondo, 55 Haw. 499, 505, 522 P.2d 1269, 1272 (1974). In other words, the re-trial shall be limited to a redetermination of the allocation of fault and damages under special verdict form question numbers 10, 11, and 12.

| | |
|---|---|
| C. Bryan Fitzgerald and Deborah Day Emerson for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Sue V. Hansen and Charles W. Crumpton for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |

