**Electronically Filed
Supreme Court
SCWC-17-0000543
31-AUG-2021
09:07 AM
Dkt. 41 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

ADRIAN-JOHN C. BRINGAS, also known as ADRIANJOHN BRINGAS,
Petitioner/Defendant-Appellant.

SCWC-17-0000543

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000543; CR NO. 1PC161000617)

[AUGUST 31, 2021]

RECKTENWALD, C.J., NAKAYAMA, J., AND CIRCUIT JUDGE CHANG,
ASSIGNED BY REASON OF VACANCY, WITH McKENNA AND WILSON, JJ.,
EACH DISSENTING SEPARATELY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

Petitioner Adrian-John C. Bringas was convicted of second-degree murder for the death of W, a minor.  In its jury instructions, the circuit court[1] properly instructed the jury on

---

[1]    The Honorable Paul B.K. Wong presided.

the lesser included offenses of second-degree murder, including third-degree assault. Hawai'i Revised Statutes (HRS) § 707-712 (2014), the statute defining third-degree assault, provides that the offense may be reduced to a petty misdemeanor if the fight or scuffle is the result of "mutual affray."[2] Consistent with the statute and Hawai'i Jury Instructions Criminal (HAWJIC) 9.21A, the circuit court submitted a special interrogatory to the jury on mutual affray. The interrogatory stated: "Did the prosecution prove beyond a reasonable doubt that the fight or scuffle was not entered into by mutual consent?" The court instructed the jury that it must answer the special interrogatory only if it found Bringas guilty of the included offense of third-degree assault. The jury found Bringas guilty as charged of second-degree murder, yet answered the special interrogatory by placing an X on the line next to "no."

Bringas argues that the circuit court abused its discretion when it denied his motion for a new trial because the jury's inconsistent verdict mandated vacatur. We disagree. There is a reasonable way to reconcile the jury verdict. The evidence in this case could have reasonably caused the jury to conclude that the altercation leading to the decedent's death

---

[2]    HRS § 707-712(2) specifically provides: "Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor."

began as mutual affray but ended in second-degree murder.  Thus, the jury's answer to the mutual affray special interrogatory is reconcilable with its verdict that Bringas was guilty of second-degree murder.  We thus affirm Bringas's conviction.

## II.   BACKGROUND

Bringas was charged by indictment with one count of murder in the second degree (Count I), in violation of HRS § 707-701.5,[3] and one count of assault in the second degree (Count II), in violation of HRS § 707-711(1)(a), (b), and/or (d).[4]  As to the first count, the State alleged that Bringas

---

[3]    HRS § 707-701.5 (2014) provided:

(1)  Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

(2)  Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[4]    HRS § 707-711 (2014) provided in relevant part:

(1)  A person commits the offense of assault in the second degree if:

(a)  The person intentionally or knowingly causes substantial bodily injury to another;

(b)  The person recklessly causes serious or substantial bodily injury to another;

. . . .

(d)  The person intentionally or knowingly causes bodily injury to another with a dangerous instrument;

. . . .

3

intentionally or knowingly caused the death of W, a minor. As to the second count, the State alleged that Bringas intentionally or knowingly caused substantial injury to, recklessly caused substantial bodily injury to, and/or intentionally or knowingly caused bodily injury with a dangerous instrument to C.U., the older brother of W.

The following evidence was adduced at Bringas's jury trial in February 2017. It was undisputed that after an altercation on the night of April 12, 2016, Bringas stabbed W in the chest, resulting in W's death, and stabbed C.U. in the leg. The State alleged that Bringas was the aggressor, while the defense argued Bringas acted in self-defense.

Bringas testified that while riding his bike in Kalihi, the chain of his bike fell off near Ahonui Street, so he stopped to fix it using a fixed blade knife he was carrying in his backpack. After fixing his bike, W approached Bringas and offered him marijuana. The two had not previously met, and Bringas testified that the mood was "dark," and Bringas felt W was "check[ing] him" by asking him questions. Then, Eileen Prescott, a family friend of W, approached Bringas and W and began smoking with W, which Bringas testified "lightened the situation[.]"

---

(2) Assault in the second degree is a class C felony.

Competing accounts of what happened next were adduced at trial.  Bringas testified that he began to gather up the trash from his bag, and while doing so W and Prescott walked away.  After walking over to a dumpster to deposit the trash, Bringas testified that he was hit hard from behind and fell to the ground.  Bringas was unsure what had hit him and caused him to fall to the ground, but he was able to get back on his feet and ran away.  However, he slipped and rolled his right ankle, causing him to fall again.  While on the ground, an unidentified individual began punching and kicking Bringas.  Bringas testified that he was able to get the person off of him and begin running again, but he was met on the street by two male individuals who attacked him.  At this point, Bringas grabbed the knife out of his waistband.[5]  He shouted at the two men to "stop, get back," and noticed that Prescott had his backpack in her hand and his belongings were on the ground.  Bringas recalled yelling at the two men and Prescott that they could have his belongings, "just let me go."  He was then hit by an object one of the men was holding and fell to the ground again. While lying face down on the floor, Bringas "fe[lt] a presence on top" of him, again hitting and kicking him.  Bringas recalled flailing his right hand - which held the knife - around his head

---

[5]    Bringas testified that he placed the knife in his waistband, rather than returning it to his backpack, because he felt uneasy and threatened by the way W was speaking to him before Prescott approached them.

in an effort to protect himself. After, "the attack just stop[ped]," and he ran away again. He ran as fast as he could down three more streets, jumping into the bed of a truck that pulled into a gas station.

Prescott testified that she saw Bringas and W talking behind the trash can, and when she turned away to talk to her boyfriend, R.K., she overhead Bringas ask W if he wanted to "buy a dime," but W stated he didn't have any money. Soon after, she noticed Bringas and W shoving one another. According to Prescott, she saw Bringas grab a shiny object from his backpack before chasing W and stabbing him. Bringas began to walk back toward the dumpster when Prescott pointed Bringas out to R.K., who tackled Bringas and the two began to fight. R.K. testified the two stopped fighting when R.K. realized Bringas had a "shining object in his hand[.]" While R.K. retreated, Bringas ran in the opposite direction. R.K. saw C.U. and pointed Bringas out to C.U., and the two began to fight. R.K. testified that C.U. hit Bringas with an unidentified object, causing Bringas to fall to the ground, but C.U. testified that he could not remember whether he had used an object to strike Bringas. Shortly after C.U. and Bringas began fighting, C.U. felt blood rushing from a slit in his shorts; he realized he had been stabbed and ran away from Bringas. C.U. was unsure whether Bringas was following him. R.K. testified that he and another

friend followed Bringas, but could not catch him.  They retreated after Bringas exited the Kuhio Park Terrace area.

Following the close of evidence, the court instructed the jury as to the elements of murder in the second degree, stating that "if and only if you find the defendant not guilty of Murder in the Second Degree, or you are unable to reach a unanimous verdict . . . then you must consider whether the defendant is guilty or not guilty" of the lesser included offenses: manslaughter, followed by assault in the first degree, assault in the second degree, and assault in the third degree. The jury was further instructed that, if assault in the third degree was proven, it was to "consider whether the fight or scuffle was entered in to by mutual consent[.]"

The court then read the mutual consent interrogatory to the jury as follows:

> In Count [I] of the indictment, if you find that the prosecution has proven the offense of Assault in the Third Degree beyond a reasonable doubt, then you must also consider whether the fight or scuffle was entered into by mutual consent, whether expressly or by conduct.
>
> You must determine whether the prosecution has proven beyond a reasonable doubt that the fight or scuffle was not entered into by mutual consent.  This determination must be unanimous and is to be indicated by answering "yes" or "no" on a special interrogatory that will be provided to you.

The verdict form for the first count consisted of six options: not guilty, guilty of murder in the second degree, guilty of manslaughter, guilty of assault in the first degree, guilty of assault in the second degree, and guilty of assault in

the third degree.  It also included the special interrogatory about mutual affray.  The jury returned the verdict form marked as follows:

> As to Count I:
>
> ___ WE THE JURY in this case, find the Defendant not guilty.
>
> _X_ WE THE JURY in this case, find the Defendant guilty as charged of the offense of Murder in the Second Degree.
>
> ___ WE THE JURY in this case, find the Defendant guilty of the included offense of Manslaughter.
>
> ___ WE THE JURY in this case, find the Defendant guilty of the included offense of Assault in the First Degree.
>
> ___ WE THE JURY in this case, find the Defendant guilty of the included offense of Assault in the Second Degree.
>
> ___ WE THE JURY in this case, find the Defendant guilty of the included offense of Assault in the Third Degree.
>
> SPECIAL INTEROGATORY
>
> Question:
>
> Did the prosecution prove beyond a reasonable doubt that the fight or scuffle was not entered into by mutual consent?  (Your answer to this question must be unanimous.)
>
> Answer:
>
> Yes ___   No _X_

As to Count II, which is not at issue here, the jury also answered the special interrogatory, marking "X" on the line next to "yes" even though it had not found Bringas guilty of assault in the third degree.  The verdict form was returned as follows:

> As to Count II:
>
> _X_ WE THE JURY in this case, find the Defendant not guilty.

> ___  WE THE JURY in this case, find the Defendant guilty as charged of the offense of Assault in the Second Degree.
>
> ___  WE THE JURY in this case, find the Defendant guilty of the included offense of Assault in the Third Degree.
>
> SPECIAL INTEROGATORY
>
> Question:
>
> Did the prosecution prove beyond a reasonable doubt that the fight or scuffle was not entered into by mutual consent?  (Your answer to this question must be unanimous.)
>
> Answer:
>
> Yes _X_  No ___

The clerk read the jury verdict forms for each count without any reference to the jury's answers to the special interrogatory questions on each verdict form.[6]  Bringas was found guilty of murder in the second degree in Count I, and acquitted of all offenses in Count II.

After reading the verdict forms, the court asked defense counsel if there was a request for a poll of the jury; defense counsel replied that there was not.[7]  The jury was excused to return to the jury deliberation room thereafter.[8]

---

[6]    We note that the better course would have been to inform counsel immediately of the jury's answers to the special interrogatory.

[7]    It appears defense counsel was not aware of the discrepancy between the finding of guilt and the answer to the mutual consent special interrogatory at that time.

[8]    Shortly after, the court noted to both parties that on the verdict form for Count I, the jury "convict[ed] the defendant of Murder in the Second Degree but also answered special interrogatory that is normally reserved for the Assault 3, Mutual Affray instruction[.]"  The circuit court proposed that the jury return the following Tuesday to "give Court and

Bringas filed a motion for a new trial contending that "the jury was . . . confused and did not fully understand the jury instructions," as demonstrated by their answer to the special interrogatory. He argued that a new trial was "required in the interest of justice under [Hawaiʻi Rules of Penal Procedure (HRPP)] Rule 33[9] given the overwhelmingly apparent confusion and misunderstanding regarding the instructions and verdict forms" and that "the verdict appear[ed] to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury, under HRS § 635-56."[10]

_____

counsel some time to research what, if anything, can be done at this point in time." The State indicated it was "fine" with that proposal, and Bringas's counsel likewise said he would "defer to the Court on how the Court wants to handle it," albeit noting that interviewing the jury could be "very messy[.]" However, after an off-the-record discussion, the circuit court decided to "reverse [its] previous order" for the jury to return the following Tuesday, and excused the jury. The circuit court asked the parties if there was "anything [they] want[ed] to place on the record" before adjourning, and counsel for Bringas stated there was "nothing."

9  HRPP Rule 33 (2012) provides:

    The court on motion of a defendant may grant a new trial to the defendant if required in the interests of justice. If trial was by the court without a jury, the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial shall be made within 10 days after verdict or finding of guilty or within such further time as the court may fix during the 10-day period. The finding of guilty may be entered in writing or orally on the record.

10  HRS § 635-56 (2016) provides:

    In any civil case or in any criminal case wherein a verdict of guilty has been rendered, the court may set aside the verdict when it appears to be so manifestly

10

After a hearing on the motion, the circuit court concluded that "a new trial [was] not required in the interest of justice and . . . accordingly and respectfully [denied Bringas's] motion for new trial." The circuit court entered judgment against Bringas for murder in the second degree and sentenced him to imprisonment for a term of life with the possibility of parole.

Bringas appealed his conviction to the ICA arguing, as relevant here, that "[t]he trial court erred in failing to resolve the jury's inconsistent verdicts prior to having them read in open court, erred in choosing which part of the verdict forms to read and which to omit, and abused its discretion in denying the Motion for a New Trial."

The ICA affirmed Bringas's conviction, holding that the circuit court did not err or abuse its discretion in denying Bringas's motion for a new trial. Although the ICA recognized that "the jury did not follow the Circuit Court's instruction to answer the special interrogatory question only if it did not reach a verdict on a greater offense," it nonetheless concluded that "the superfluous answering of the special interrogatory did not undermine or cast any doubt upon the jury's verdict, much

_____

against the weight of the evidence as to indicate bias, prejudice, passion, or misunderstanding of the charge of the court on the part of the jury; or the court may in any civil or criminal case grant a new trial for any legal cause.

less create an irreconcilable inconsistency with the jury's

verdict that Bringas was guilty of Murder Second."

Bringas filed an application for writ of certiorari

with this court, presenting the following three-part question

for our review:

> Whether the ICA gravely erred in (1) affirming the
> circuit court's failure to resolve the jury's inconsistent
> verdicts prior to having them read in open court; (2)
> concluding the circuit court did not err in choosing which
> part of the verdict forms to read and which to omit; and
> (3) holding that the circuit court did not abuse its
> discretion in denying Bringas's motion for a new trial.

### III. STANDARD OF REVIEW

> As a general matter, the granting or denial of a
> motion for new trial is within the sound discretion of the
> trial court and will not be disturbed absent a clear abuse
> of discretion. . . . The trial court abuses its discretion
> when it clearly exceeds the bounds of reason or disregards
> rules or principles of law or practice to the substantial
> detriment of a party litigant.

State v. Stone, 147 Hawai'i 255, 270, 465 P.3d 702, 717 (2020)

(citations omitted).

### IV. DISCUSSION

Bringas challenges the circuit court's reading of the

verdicts without first addressing the jury's mistake in

answering the special interrogatory. Bringas argues that once

the court became aware of the "obvious inconsistencies" in the

verdicts, "it should have halted the reading, made counsel aware

of the problem and/or sought supplemental briefing on

resolutions to the problem. The court should then have

reinstructed or otherwise clarified with the jury the meaning of

12

their verdict choices." This error, Bringas contends, warranted a new trial because the jury's verdict in Count I was irreconcilable and the judge had dismissed the jury. For the following reasons, Bringas's arguments lack merit.

**A.    The Circuit Court Was Not Required to Reconvene the Jury to Address or Resolve Its Inconsistent Verdict**

Bringas contends that the circuit court failed to follow "procedure[ ]" by discharging the jury without first having them resolve or address the obvious inconsistencies with their verdict. Bringas does not argue that the verdict was against the weight of the evidence, but instead asserts that the circuit court erred in "completely failing to address" the jury's answer to the special interrogatory despite concluding that Bringas was guilty of murder in the second degree. In support of this contention, Bringas cites Dias v. Vanek, 67 Haw. 114, 679 P.2d 133 (1984).

Dias involved the purchase of real property. Shortly after moving in, the buyers discovered extensive termite damage in the master bedroom that was not immediately visible because the damaged wall had been covered with wallpaper. Dias, 67 Haw. at 115-16, 679 P.2d at 134. The buyers sued the sellers for recission of the purchase contract and the refund of all sums paid, including a $20,000 down payment, and the sellers counterclaimed for breach of contract. Id. at 116, 679 P.2d at

13

135. After trial, a jury concluded that the inspector's negligent inspection and the sellers' concealment of the damaged wall resulted in $16,850.56 in damages to the buyers for a post-purchase inspection and fumigation costs. Id. However, the jury also awarded the sellers $6,263 in damages for breach of the sale agreement; the verdict was ambiguous as to whether this award was in addition to or in lieu of the $20,000 down payment. Id. The circuit court, upon motion by the buyers for the return of their down payment, and after the jury had already been discharged, concluded that the sellers were entitled to retain the down payment, in addition to the $6,263 damages awarded by the jury. Id. This court reversed, recognizing that the "[d]etermination of the proper amount of damages . . . is within the exclusive province of the jury," and "when the pertinent instruction is read in conjunction with the verdict form, it appears that the jury may have intended that the damages of $6,263 were inclusive rather than exclusive of the $20,000 down payment." Id. at 117-18, 679 P.2d at 135-36 (citation omitted).

Dias is distinguishable from this case for two reasons. First, the jury instructions in Dias were themselves ambiguous. Regardless of the amount awarded by the jury to the sellers, it would have remained unclear, partly due to the court's instructions to the jury, whether the jury intended for the award to include the $20,000 down payment. Additionally,

14

the jury's verdict was consistent with the court's instructions despite failing to clearly resolve a crucial factual issue that remained "within the exclusive province of the jury[.]" Id. Thus, whether the jury intended for the sellers' damages award to be inclusive of the $20,000 award was unclear, and the court invaded the province of the jury by amending the damages award to reflect a verdict that was not clearly what the jury intended. By contrast, here, the jury's verdict clearly evinces the jury's intent to find Bringas guilty of second-degree murder. And the jury's answer to the special interrogatory - although contrary to the circuit court's instructions - does not make the intent to find Bringas guilty of second-degree murder for the stabbing of W ambiguous or unclear.

Additionally, Bringas cites to this court's language in Dias that the "remedy of an ambiguous verdict is to have the jurors return to clarify the verdict," and when "the jury ha[s] been discharged . . . the only available remedy is a remand for a new trial[.]" Dias, 67 Haw. at 118, 679 P.2d at 136. As such, Bringas argues that Dias provides a specific "procedure[ ]" that a circuit court should follow when presented with an ambiguous jury verdict. However, the verdict here is not ambiguous - the jury clearly found Bringas guilty of second-degree murder for the stabbing of W. Moreover, while Bringas is correct that we explained in Dias that the "preferred remedy" is

15

to have the jury reconvene to clarify its verdict, we also concluded that the court "may . . . amend a jury verdict when the <u>intention of the jury is clear</u>." Id. at 117, 679 P.2d at 135 (citations omitted) (emphasis added). Thus, it was not an abuse of discretion for the circuit court not to reconvene the jury to address its verdict finding Bringas guilty of second-degree murder and subsequently answering the special interrogatory on mutual affray.

In addition to Dias, Bringas also cites <u>Kanahele v. Han</u>, 125 Hawai'i 446, 263 P.3d 726 (2011), in support of his argument that the circuit court is required to reconvene the jury when confronted with an allegedly-inconsistent verdict. However, in relying on <u>Kanahele</u>, Bringas conflates a verdict that is improper as a matter of law with one that is contrary to the circuit court's instructions, but nonetheless remains reconcilable. In <u>Kanahele</u>, a personal injury case, this court concluded that the jury's verdict awarding damages in the amount of $1 in general damages but special damages of $12,280.41 was improper and remanded for a new trial on damages. 125 Hawai'i at 457, 263 P.3d at 737. This court explained that "it is well established" that a jury verdict that awards special damages but not general damages is "improper," and thus we "invalidated" the jury's verdict, concluding that a general damages award of $1 was the legal equivalent of awarding no general damages. Id. at

16

456-457, 263 P.3d at 736-37 (citations and quotation marks omitted). The circuit court in <u>Kanahele</u> thus erred in entering the jury's verdict because the awarded remedy was improper as a matter of law. In contrast, Bringas's verdict reflected that the jury did not follow the circuit court's instructions regarding when to answer the special interrogatory on mutual affray, but the jury's failure to follow the instructions did not render its verdict improper as a matter of law. The answer to the special interrogatory does not conflict with or disprove any element of murder in the second degree as mutual affray is not a defense to murder in the second degree.

Thus, the circuit court's decision not to address the jury's mistake in answering the special interrogatory despite finding Bringas guilty of second-degree murder was not an abuse of discretion, nor was it a departure from prescribed or mandatory procedure.

## B. The Circuit Court Did Not Abuse Its Discretion When It Denied Bringas's Motion for A New Trial

Bringas contends that "a new trial should have been granted 'in the interest of justice'" and points to HRS § 635-56 and HRPP Rule 33 in support of this argument. HRS § 635-56 states:

> In any civil case or in any criminal case wherein a verdict of guilty has been rendered, the court may set aside the verdict when it appears to be so manifestly against the weight of the evidence as to indicate bias, prejudice, passion, or <u>misunderstanding of the charge of the court on</u>

17

> the part of the jury; or the court may in any civil or
> criminal case grant a new trial for any legal cause.

(Emphasis added.)

Since the verdict "reflected a misunderstanding of the charge of the court on the part of the jury," Bringas argues the circuit court abused its discretion by denying his motion for a new trial. However, that the jury misunderstood the court's instructions does not mean that the verdict must be set aside. The jury returned a reconcilable verdict reflecting a theory of the case that the evidence at trial supported, and we therefore affirm the denial of the motion for a new trial.

1. **Before Vacating a Criminal Conviction, the Court Must First Search for a Reasonable Way to Reconcile Any Inconsistencies in the Verdict**

As a preliminary matter, we address Bringas's contention that the jury verdict was "irreconcilably inconsistent." This standard comes from Carr v. Strode, in which this court held, "A conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory." 79 Hawai'i 475, 489, 904 P.2d 489, 503 (1995) (emphasis added) (citation omitted).[11] Thus, the court must first "search

---

[11] A "special verdict," which was at issue in Carr, is distinct from a "special interrogatory," at issue here. A "special verdict" is "[a] verdict in which the jury makes findings only on factual issues submitted to

18

for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort" before it vacates the jury's verdict and remands the case for a new trial.  Id. (citing Toner v. Lederle Laboratories, 828 F.2d 510, 512 (9th Cir. 1987) (citations omitted)).

Bringas argues - for the first time during oral argument - that Miyamoto v. Lum, 104 Hawaiʻi 1, 7, 84 P.3d 509, 515 (2004), not Carr,[12] sets the appropriate standard for courts to review jury verdicts.  However, this misconstrues the holding of Miyamoto.  In Miyamoto, this court concluded that the trial court erred in denying the petitioner's motion for a new trial because "our review of the record indicate[d] that the jury

---

them by the judge, who then decides the legal effect of the verdict." Black's Law Dictionary (11th ed. 2019).  A "special interrogatory" is "[a] written jury question whose answer is required to supplement a general verdict."  Id.  The mutual affray defense question to the jury was required to supplement the jury's general verdict of guilty on third-degree assault, were it to reach that verdict.  Nonetheless, the test set forth in Carr applies to allegedly inconsistent special interrogatories, as well as special verdicts; the two are treated similarly in the law.  See 75B Am. Jur. 2d Trial § 1526 (2020) ("The findings in special verdicts and special interrogatories submitted with a general verdict cannot be internally inconsistent.  However, a verdict will not be considered irreconcilably inconsistent if supported by any reasonable hypothesis.  A jury's special findings are inconsistent with a general verdict only where they are clearly and absolutely irreconcilable with the general verdict when, as a matter of law, the special finding when taken by itself would authorize a judgment different from that which the general verdict will permit." (footnotes omitted) (emphasis added)).

[12]   Although Bringas cited to Carr as supporting authority in his opening brief filed in the ICA, he concedes in his certiorari application that Carr does not support the conclusion Bringas asks us to reach today.  Instead, in his application Bringas argues that this court should rely on, inter alia, Dias v. Vanek, 67 Haw. 114, 679 P.2d 133 (1984), and Kanahele v. Han, 125 Hawaiʻi 446, 263 P.3d 726 (2011).  However, as discussed in the previous section, those cases are distinguishable.

instructions conflicted with the instructions on the special verdict form and misled the jury." Id. at 9, 84 P.3d at 517. The jury in Miyamoto concluded that defendant Kenneth Lum's negligence was not the legal cause of plaintiff Nobuo Miyamoto's injury. Id. at 6, 84 P.3d at 514. However, the jury nonetheless awarded Miyamoto general and special damages totaling $18,446. Id. This court held:

> [I]f the answers to Question 6 and 8 are ignored, we are left with a verdict finding that Lum's actions were not the legal cause of Nobuo's injuries; thus, Lum would prevail. However, if the answer to Question 1 is ignored, we are left with a verdict finding that Lum's actions contributed twenty-five percent to Nobuo's "present condition," amounting to $18,446 in damages; thus, Nobuo would prevail. Inasmuch as ignoring the answer to Question 1 "requires the entry of a judgment different from that which the court has entered" . . . the verdict is irreconcilably inconsistent.

Id. at 9, 84 P.3d at 517.

The Miyamoto court carefully scrutinized the verdicts and concluded that there was no reasonable way to reconcile them. Miyamoto's holding is thus consistent with the mandate in Carr that the court is bound to search for a reasonable way to reconcile the verdicts before vacating a conviction on that ground.

Although Miyamoto and Carr are civil cases, the principle that appellate courts should attempt to first reconcile seemingly-inconsistent verdicts before vacatur finds broad support in the criminal context. E.g., State v. Holmes, 24 P.3d 1118, 1121-22 (Wash. Ct. App. 2001) (concluding that a

20

general verdict finding defendant guilty of first degree robbery under the statutory alternative of being armed with a deadly weapon was not irreconcilably inconsistent with a special verdict rejecting a sentencing enhancement for being armed with a deadly weapon); State v. Connolly, 518 A.2d 458, 459 (Me. 1986) (disagreeing with the defendant's contention that "the verdicts are irreconcilably inconsistent" because she was charged with two counts of drug trafficking, but only found guilty of one count); State v. McClary, 679 N.W.2d 455, 461 (N.D. 2004) (asking whether allegedly-inconsistent verdicts can be "rationally reconciled"); State v. Lopez, 892 P.2d 898, 902 (Idaho Ct. App. 1995) ("[T]he threshold question in this case is whether the verdicts are reconcilable on a rational basis[.]" (citation omitted)); United States v. Pierce, 940 F.3d 817, 821 (2d Cir. 2019) (noting that courts of appeal should first "attempt to harmonize" a jury's verdict of guilt that directly conflicts with answers to special interrogatories, so as to find a "fair reading" that renders the verdicts "consistent" (citations omitted)); United States v. McBride, 962 F.3d 25, 34 (1st Cir. 2020) (holding that a verdict and special interrogatory were not "irreconcilably inconsistent" because "[i]t is possible to give effect to both the 'guilty' verdict and the answer to the special interrogatory").

We agree that requiring appellate courts to first attempt to reconcile an inconsistent jury verdict is appropriate.  Moreover, a reviewing court advances important public policy considerations when it attempts to preserve a jury's seemingly inconsistent verdict before vacatur.  "Public policy demands that the sanctity of jury deliberations be vigorously guarded to ensure frankness and open discussion.  The purpose for providing secret deliberations is to ensure the impartiality of the jury."  Oahu Publ'ns, Inc. v. Ahn, 133 Hawai'i 482, 498-99, 331 P.3d 460, 476-77 (2014) (brackets, quotation marks, and citations omitted)).  Accordingly, the jury trial process is structured so as to preserve the integrity of jury deliberations.  Cf. Pierce, 940 F.3d at 823 ("Courts have always resisted inquiry into a jury's thought processes." (citing United States v. Powell, 469 U.S. 57, 67 (1984)).  The requirement that an appellate court search for any reasonable way to reconcile a jury's verdicts serves to avoid speculation into the jury's confidential deliberations and to safeguard the result of those deliberations, if at all possible.  Indeed, in protecting the sanctity of a jury's verdict, other courts – including the United States Supreme Court – take a more restrictive approach and will not consider an appeal of a jury's verdict solely because of alleged inconsistencies.  Dunn v. United States, 284 U.S. 390, 393 (1932) ("Consistency in the

22

verdict is not necessary."); see also Harris v. Rivera, 454 U.S. 339, 345 (1981) (recognizing that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." (citations omitted)); Beattie v. State, 924 N.E.2d 643, 649 (Ind. 2010) ("Jury verdicts in criminal cases are not subject to appellate review on grounds that they are inconsistent, contradictory, or irreconcilable."). We do not endorse the view that inconsistent verdicts are per se unreviewable. Rather, a court tasked with determining the effect of an inconsistent verdict should "attempt to harmonize" the inconsistencies in the verdict so that they are reconcilable. Pierce, 940 F.3d at 821. However, we point to Dunn and similar cases to highlight the sanctity with which a jury verdict is treated in American law, and appellate courts' general unwillingness to speculate as to the jurors' thought processes. Consistent with these principles, our rule respects the jury's verdict when possible, which can be done when the record supports a reasonable way to harmonize seemingly-inconsistent verdicts.

The dissents instead would conclude that "[a] verdict in a criminal case should be certain and devoid of ambiguity." Wilson, J., Dissent at 26 (citing Yeager v. People, 462 P.2d 487, 489 (Colo. 1969)); see also McKenna, J., Dissent at 3. Respectfully, the dissents misconstrue the language in Yeager, which is not in conflict with this opinion. In Yeager, the

23

defendant was charged with, relevant here, the unlawful sale of narcotics "with the intent to induce and aid another to unlawfully use and possess narcotic drugs[.]" Id. at 487. However, the jury "declined to sign either of the [verdict] forms provided by the court, and proceed[ed] to" prepare and sign their own verdict form which stated: "We, the jury, duly empaneled and sworn in the above entitled cause, do upon our oaths, find the defendant guilty of unlawfully and feloniously selling a narcotic drug as charged in the first count[.]" Id. at 488. The Colorado Supreme Court vacated Yeager's conviction, concluding that "the verdict prepared . . . by the jury relating to count one is at best, . . . unclear as to whether the jury was finding that the defendant not only sold a narcotic drug but also possessed" intent to induce and aid another to unlawfully use and possess narcotics. Id. at 489. Thus, the jury's verdict was ambiguous, in that it "did not include all the essential elements of the offense charged." Id. at 488. But Colorado law is also clear that "consistency of verdicts is not required." People v. Frye, 898 P.2d 559, 560 (Colo. 1995).[13] In

---

[13] In fact, in Frye, the Supreme Court of Colorado concluded that the verdicts were irreconcilable but, adopting the federal rule, nonetheless allowed them to stand. 898 P.2d at 566 ("We reject such an implausible explanation and conclude that the verdicts are indeed inconsistent."); id. at 570 (upholding the inconsistent verdict). The court reasoned that "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." Id. at 569 (quoting Powell, 469 U.S. at 66) (quotation marks omitted).

other words, verdicts may be devoid of ambiguity <u>and</u> nevertheless be inconsistent.[14]

Here, Bringas's verdict in Count I <u>was</u> free and devoid of ambiguity – the verdict clearly conveys the jury's intention to convict Bringas of second-degree murder.  That Bringas and W entered a scuffle by mutual affray does not negate any element of that offense.

We therefore conclude that <u>Carr</u> provides the correct standard, and the court is bound to "search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort" before granting a new trial.  79 Hawaiʻi at 489, 904 P.2d at 503 (citation omitted).

---

[14]     In her dissent, Justice McKenna additionally cites <u>Barnhill v. State</u>, 41 So.2d 329 (Fla. 1949) and <u>Hyslop v. State</u>, 68 N.W.2d 698 (Neb. 1955).  McKenna, J. Dissent at 3.  Respectfully, these cases are factually distinguishable and do not support as sweeping a rule as the dissent suggests.  <u>Barnhill</u> involved the distinct question of whether, to convict a defendant of a repeat violation of a liquor law, the jury must explicitly find "the historical fact of the former conviction."  41 So.2d at 331.  While the Florida Supreme Court held that an explicit finding was required, it further explained that "with respect to jury verdicts in criminal cases generally the rule appears to be that while a verdict must be certain and impart a definite meaning free from ambiguity, <u>all fair intendments should be made to sustain it</u>."  <u>Id.</u> (emphasis added).  Thus, the Florida Supreme Court recognized, as do we, that verdicts should be sustained when reasonably possible.  Likewise, <u>Hyslop</u> involved a situation in which the jury returned a guilty verdict in open court, but the record contained a not-guilty verdict form that had been partially erased in an apparent attempt to "cancel" it.  68 N.W.2d at 702.  The Nebraska Supreme Court affirmed the guilty verdict, noting that "[a]ll presumptions exist in favor of the regularity and correctness of the orders and judgments of courts of general jurisdiction," and "[i]f, <u>upon the whole record</u>, so construed, it is clear beyond any reasonable doubt that the jury found the defendant . . . guilty of the charge contained in the indictment, the verdict is sufficiently definite."  <u>Id.</u> at 701-02 (citations and quotation marks omitted) (emphasis added).  Thus, although <u>Hyslop</u> is factually distinguishable from the instant case, it recognizes that verdicts should be evaluated in light of the entire record before vacating them.

### 2. The Jury's Inconsistent Verdict is Reconcilable

Bringas argues that the ICA erred in concluding that the jury's inconsistent verdict in Count I was reconcilable. This argument is unpersuasive. Second-degree murder requires that the defendant "intentionally or knowingly causes the death of another person." HRS § 707-701.5. Third-degree assault is a lesser included offense of second-degree murder, and the statute criminalizing third-degree assault includes the mitigating defense of "mutual affray," which reduces the offense to a petty misdemeanor: "Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor." HRS § 707-712(2). Mutual affray is not a defense to second-degree murder.

Prescott testified that she saw Bringas and W fist fighting, then watched Bringas grab a shiny object from his backpack as W was running away, chase after W, and stab him. Similarly, R.K. testified that he saw W and Bringas punching each other, then saw W run away from Bringas; he further testified that he noticed a shiny object in Bringas's hand. Given this testimony, the jury's finding of guilty on the second-degree murder count is consistent with its finding that the State did not disprove the mutual affray defense to third-degree assault. Prescott and R.K.'s testimonies support the conclusion that W and Bringas entered into the initial fight by

26

mutual consent <u>and</u> that Bringas then chased after W and stabbed him, rendering Bringas guilty of second-degree murder. The jury's findings that there was a mutual affray and that Bringas subsequently committed second-degree murder were consistent, and the jury's verdicts are thus reconcilable.[15]

The jury could reasonably conclude both that there was a mutual affray and that the circumstances of the mutual affray were not such that Bringas could reasonably believe that deadly force was necessary to protect himself. Indeed, the text of the jury's verdicts indicates they concluded exactly that. Regardless of how the altercation between Bringas and W began, the jury's guilty verdict on second-degree murder supports the conclusion that the defendant used unjustifiable force to finish that altercation.[16]

---

[15] Although the jury's verdict as to Count II are not challenged on appeal since Bringas was acquitted, those, too, reflect a similarly coherent view of the evidence. Prescott testified that just after the altercation between Bringas and W, she pointed out Bringas to C.U., W's brother, and C.U. grabbed Bringas. Prescott further testified that Bringas stabbed C.U. during the fight that ensued. Similarly, R.K. testified that he pointed out Bringas to C.U., saw C.U. hit Bringas with an object, and then saw the two of them fight before C.U. walked away; he later learned that C.U. had been stabbed. Thus, the evidence supported the jury's finding that the prosecution had disproved mutual affray with regard to C.U. Bringas did not mutually enter into the fight with C.U.; rather, C.U. grabbed him. However, the jury could have chosen to credit Bringas's contention that he stabbed C.U. in self-defense after C.U. grabbed him, and thus acquitted Bringas of second-degree assault with respect to C.U.

[16] In his dissent, Justice Wilson suggests that answering the special interrogatory supports the idea "that the jury similarly misunderstood the self-defense instruction in Count 1 and mistakenly assumed self-defense would apply only if . . . the State proved beyond a reasonable doubt that W, not Bringas initiated the altercation." Wilson, J., Dissent at 25-26. However, recognizing the "sanctity of jury deliberations," <u>Oahu</u>

The Colorado Court of Appeals came to a similar conclusion in People v. Brooks. There, the jury found the defendant guilty of "menacing" – an element of which is the use of a deadly weapon – but returned a special interrogatory finding that the defendant "did not use, or threaten the use of, a deadly weapon" during the burglary for which he was also charged. 471 P.3d at 1173. These verdicts were reconcilable because, "[b]ased on the evidence at trial, the jury could well have determined that, though [the defendant] did not have a weapon when he entered the home, once inside he obtained the weapon from somewhere inside the home and then threatened the victim with it." Id. at 1176. Nothing about the jury's response to the special interrogatory "negate[d] any element of the offense of menacing." Id. at 1177.

United States v. Pierce is also instructive. There, the district court had set aside a guilty verdict for conspiracy to possess with intent to distribute four types of narcotics and concluded that the conviction was inconsistent with the jury's findings on a special interrogatory form concerning the weight of the narcotics; the jury had marked that the government had "not proven" that the defendant "conspired to possess with

_____

Publ'ns, Inc., 133 Hawaiʻi at 498, 331 P.3d at 477, we resist "inquiry into [the] jury's thought processes" in reaching its verdict, Pierce, 940 F.3d at 823, and there is nothing in the record here to suggest the jury was confused about self-defense.

intent to distribute" the four narcotics.  Pierce, 940 F.3d at 819.  The United States Court of Appeals for the Second Circuit affirmed, concluding that the verdicts were "metaphysically impossible to reconcile."  Id. at 824 (citation and quotation marks omitted).  In so holding, the court recognized, "To enter a guilty verdict, the court would have needed to overlook the special verdict findings that [the defendant] did not conspire to distribute any of the drugs at issue in the case."  Id. at 823 (quoting United States v. Shippley, 690 F.3d 1192, 1195 (10th Cir. 2012)).  In other words, the special interrogatory was irreconcilable with the general verdict because it was impossible to "give[] full effect" to both.  Shippley, 690 F.3d at 1195.

The general verdict and special interrogatory in this case do not present a "metaphysical impossib[ility]," Pierce, 940 F.3d at 824, but instead resemble the verdict at issue in Brooks.  While the jury's finding that Bringas and W entered into a mutual affray would have reduced the third-degree assault charge to a petty misdemeanor, "the response to the special interrogatory regarding [mutual affray] did not negate any element of the offense of [second-degree murder]."  Brooks, 471 P.3d at 1177.  And because the evidence supports that the jury "could well have determined" that the confrontation began as mutual affray but ended in second-degree murder, it is possible

to "give[] full effect" to both the special interrogatory and the general verdict based on the evidence in this case. Shippley, 690 F.3d at 1195. The verdict is not irreconcilably inconsistent.

## V. CONCLUSION

For the foregoing reasons, we hold that the circuit court did not abuse its discretion in dismissing the jury without first having them rectify the inconsistent jury verdict, or by denying Bringas's motion for a new trial. Accordingly, the ICA's November 13, 2018 judgment on appeal is affirmed.

| | |
|---|---|
| Phyllis J. Hironaka<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Sonja P. McCullen<br>for respondent | /s/ Gary W.B. Chang |



30